EXHIBIT #2

Approved, SCAO

Original - Court
1st copy - Defendant
2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>33rd JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS | CASE NO.<br>23-0083-28Cb |
|---|---|---|

| Court address<br>301 State Street  Charlevoix, MI 49720 | Court telephone no.<br>(231) 547-7243 |
|---|---|

| Plaintiff's name(s), address(es), and telephone no(s).<br><br>Douglas Janiskee<br>304 W. Lincoln St.<br>Charlevoix, MI 49720 | v | Defendant's name(s), address(es), and telephone no(s).<br><br>Vertafore, Inc.<br>Attn: Ms. Maggie Warren, General Counsel<br>999 18th Street, Suite 400<br>Denver, CO 80202<br>(517) 347-7340 |
|---|---|---|

Plaintiff's attorney, bar no., address, and telephone no.

*Charlevoix County Clerk*
*JUL 25 2023*

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

*TRUE COPY*
*of a document on file*
*in the office of the*
*Charlevoix County...*

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer  pending.

Summons section completed by court clerk.        | SUMMONS |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| July 5 2023 | July 25 2023 | _____ Deputy |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01  (9/19)  **SUMMONS**                          MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

STATE OF MICHIGAN
IN THE 33rd JUDICIAL CIRCUIT COURT
FOR THE COUNTY OF CHARLEVOIX

**Douglas Janiskee**,

Plaintiff

vs.

**Vertafore, Inc.,**
**Roper Technologies, Inc.**,
and **Justin Phillips**,

Defendants

Douglas Janiskee,
Self-Represented Plaintiff

Maggie Warren, Co-Defendant General Counsel,
Vertafore, Inc.
999 18th Street, Suite 400
Denver, CO 80202
(800) 444-4813

John K. Stipancich, Co-Defendant General Counsel,
Roper Technologies, Inc.
6901 Professional Parkway E, Suite 200
Sarasota, FL 34240-8473
(941) 556-2601

Justin Phillips,
Co-Defendant
Lansing, MI 48911
(517) 290-2164

Circuit Court Case No.
23-0083-28 CD

Hon. Roy C. Hayes, III



Charlevoix County
Clerk

JUL 2 5 2023

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

## First Amended Complaint for Damages and Demand for Jury Trial

STATE OF MICHIGAN
IN THE 33rd JUDICIAL CIRCUIT COURT
FOR THE COUNTY OF CHARLEVOIX

**Douglas Janiskee**,

Plaintiff

vs.

**Vertafore, Inc.,**
**Roper Technologies, Inc.,**
and **Justin Phillips**,

Defendants

Circuit Court Case No.

23-0083-28 CD

Hon. Roy C. Hayes, III

[ JUDGE'S COPY ]

Charlevoix County

JUL 2 5 2023

Douglas Janiskee,
Self-Represented Plaintiff

Maggie Warren, Co-Defendant General Counsel,
Vertafore, Inc.

John K. Stipancich, Co-Defendant General Counsel,
Roper Technologies, Inc.

Justin Phillips,
Co-Defendant

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

## Motion to Exceed Page Limits

Self-represented plaintiff Douglas Janiskee, who is unsure if pleadings in Michigan are subject to length restrictions, moves the Circuit Court, just in case, to be allowed the glorious full 84 pages of his complaint, stating further that:

1.  Janiskee is sorry to the Circuit Court and to the defendants for its length.

2.  Janiskee himself would rather it was not 500 numbered paragraphs long.

3.  Such are among the reasons why the defendants should have thought twice before acting, as described in the complaint, in their failed attempt at making Janiskee tongue-tied and flustered through an ambush ploy, with their now being asked to answer 84-pages of the actual truth of it all being simply their own doing, and a tiny price to pay versus the real cost of their conduct of which Janiskee intends to be their final-ever victim.

4.  Janiskee's previous motion, essentially for more time to prepare and which the Circuit Court graciously granted, mentioned reasons why he had not had enough time and should be allowed more, with Janiskee's given reasons being earnest but with life since then having not cooperated.

5.  Janiskee's initial complaint was hastily stripped of whatever content that seemed to him not-quite-ready for a court as his first deadline approached.

6.  Given more time, stripped-out content was put back, for sculpting it right.

7.  Some of the clay has been moved to affidavits which are near completion.

8.  However, not much else Janiskee wanted for the complaint has happened.

9.  The complaint is not what Janiskee considers to reflect who he truly is, which is someone who cares about treating others correctly even if and when Janiskee is frustrated with said random others for acting stupidly.

10. The complaint however reflects the truth, and Janiskee can prove it.

11. The complaint is what Janiskee sees more as an okay first-draft to show to an attorney, with the intent that the attorney will strip-out 90% of it, while Janiskee randomly says, "No, not that part!", and coolly based on courtroom experience that Janiskee lacks will know what to keep and how to present it, with Janiskee's talk here of his integrity not meaning he does not want to be calling the defendants funny names, but rather that he knows such is not fitting of the forum of a court of law, etc., etc., especially if he is the one bringing the case, with what Janiskee thinks is ethical being that Janiskee finds an ethical attorney to be his filter.

12. The problem is, finding an attorney is not like in the movies, which as far as Janiskee knows always in every case entirely skips that part.

13. Yet, why is any of this Janiskee's fault, and what does he really owe?

14. Janiskee is sorry if the complaint is too long, or is not sweet enough, or fails on some technicality, none of which changes what was done to him.

15. The toll on Janiskee's life of all of this has been heavy enough already.

16. And if the defendants think that means Janiskee cannot sustain what they might try to do to him, for however long they try it, like he has seen them do to widows of the ones who made these asbestos mongerers rich, they would be woefully misreading Janiskee's offers borne of pragmatism.

17. Janiskee recognizes the rights of the defendants to try to get the truth dismissed, or have it all stricken, or to futilely demand arbitration.

18. If the defendants try to have Janiskee's complaint dismissed and they lose that coin toss, what they then stand to lose will be more than dollars.

19. However, if they are who they so ostentatiously portray themselves to be, they will skim the complaint and immediately agree that none of it should have happened, and that they need to do better, and that frankly Janiskee has done them a huge free consulting gig favor, particularly when they see the other hundreds of pages of affidavits yet to come.

20. The defendants should be easily able to forgive Janiskee for being snarky.

21. If some of the complaint tries to take-on too much, or strays into areas he would have tried to do better if given infinite time, they should be able to forgive that too, and agree that they caused all of this utterly needlessly.

22. Most importantly, Janiskee is not the first to deal with this, and he has reason to believe that when he lets his first salvo of subpoenas loose, these guys will have more to ponder than just *Nichols v Vertafore, Inc.*

23. The perhaps overly-long 500-numbered-paragraphs complaint could in an ideal scenario actually save everyone a ton of extra time and trouble.

24. Janiskee has given the time and effort to show why the defendants, if they are wise, will not fight this in any way, and will submit their unconditional surrender to the one in this whose options are infinite despite what they make employees believe with their contract intimidation tactic clauses crap.

25. This is a new era in which catching bad guys does not take an FBI team.

26. Janiskee cannot think of anything any corporate-side employment lawyer can really do for defendants but thumb through books for them when an ethically-acting individual is armed with Workplace Full-Coverage Replay.

27. Seriously, what value does an attorney provide for any adversary of Janiskee if in every single scenario of what a corporate attorney will try to do to him, Janiskee just replies, "Oh yeah?", and plays back the tape?

28. If Janiskee here were to confess to barking at the moon and flashing his nipples in shopping malls and drinking milk straight from the gallon jug and just being an utterly unhinged maniac and awful person, the thing is, it never happened at Vertafore, and it was clearly never any apparent factor when he was being constantly praised, and, *he has all of it captured.*

29. In situations of real-time reality attorney magical powers all disappear.

30. Nobody thinks, "Oh no! My baby is trapped in that fire! Call an attorney!"

31. Janiskee possesses the next best thing to being Janiskee in real-time at Vertafore from start-to-finish, and the law practitioner this case needs is the kind who chooses to work at a courthouse instead of a tower with an ugly logo, and chooses public service for deciding what is fair and just, without fear or favor, instead of using a Cooley Law degree to shaft fellow employees for a paycheck and all the prestige of being a soulless drone (https://www.google.com/search?q=the+worst+law+school+in+america).

32. If the defendants choose to fight this, Janiskee will respond ethically.

33. Any cans of snakes about to be open are purely of their own breeding.

34. Janiskee urges the defendants to think carefully about their real options.

35. The defendants need to know that Janiskee has literally nothing left.

36. If the defendants win, he will just move back to Japan and on to Phase II.

37. However, if the defendants will together agree that they are not going to take any steps to fight Janiskee's complaint, and if the 33rd Circuit Court is willing to be please make itself the true and correct referee this matter, when Janiskee needs a real court with real powers that will do the right thing for both sides, while blocking the slippery chutes from truth and transparency out of which the defendant may to try to skate, Janiskee offers that he will be incredibly reasonable and flexibly to all if they just apologize unconditionally, accept responsibility for fixing things, and show Janiskee how what was done to him is going to be made no longer acceptable nor ever again possible at Vertafore or any Roper subsidiary, not on the logic that Roper and Vertafore must comply with Janiskee's view of how companies should act, but that they have to comply with the way they themselves portray their ethics, to investors—presently fallaciously.

38. In either case, whether the defendants want a fight or not, as soon as Janiskee has served his complaint, his top priority will be finding counsel, provided he finds an attorney able to execute a Janiskee-scale vision.

39. As such, Janiskee would be grateful for the possibility of submitting a second amended complaint if a prospective hired attorney so advises.

40. Janiskee furthermore is not unwilling to stipulate to adjustments in the complaint, by for example moving parts of it to his affidavits instead.

Mostly what Janiskee asks is that the length of the complaint be allowed and that its imperfections not be reason to throw-out the whole case, since Janiskee is offering to work reasonably if others are, and given that Janiskee is not the true severely imperfectly-acting one in this thing.

Respectfully submitted,

Douglas Janiskee
Plaintiff

TRUE COPY
of a document on file
June 25, 2023    in the office of the
Charlevoix County Clerk

*Charlevoix County Clerk*
*JUL 25 2023*

**Certificate of Service**

I certify that on the date below a copy of this instrument was served on the Defendant's attorney or a corporate officer by first-class mail or equivalent suitable means to their last-known address as defined in MCR 2.107(C)(3).

July 25, 2023
_____
Date

Douglas Janiskee

Charlevoix County
Clerk

JUL 2 5 2023

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

STATE OF MICHIGAN
IN THE 33rd JUDICIAL CIRCUIT COURT
FOR THE COUNTY OF CHARLEVOIX

**Douglas Janiskee**,

Plaintiff

vs.

**Vertafore, Inc.,**
**Roper Technologies, Inc.**,
and **Justin Phillips**,

Defendants

Douglas Janiskee,
Self-Represented Plaintiff

Maggie Warren, Co-Defendant General Counsel,
Vertafore, Inc.

John K. Stipancich, Co-Defendant General Counsel,
Roper Technologies, Inc.

Justin Phillips,
Co-Defendant

Circuit Court Case No.
23-0083-28 CD

Hon. Roy C. Hayes, III



Charlevoix County
Clerk

JUL 2 5 2023

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

## First Amended Complaint for Damages and Demand for Jury Trial
### Overview

Self-represented plaintiff Douglas Janiskee demonstrated in actions his care for the most precious assets of his employer, defendant Vertafore Inc. ("Vertafore"), and its parent company, Roper Technologies, Inc. ("Roper"), foremost among them being the years of hard-won niche expertise of the business analysts and technical consultants comprising the teams for which Janiskee had served as project manager—and, crucially, those employees' goodwill (*See* ¶ 101, p.22).

With them, he endured unprovoked affronts from arguably America's least trusted industry (*See* ¶ 119, p.28), while from afar making speeches at them was a so-called leadership (*See* ¶ 52, p.17), who at last have fully pilfered plaintiff's pride personally and project managerially...purely pointlessly.

Predictably, world-class manager and native Michigander Douglas Janiskee with this complaint now submits, to the Honorable 33rd Circuit Court of his adopted beautiful Charlevoix County, that to defendants he patiently and earnestly, albeit with ever firm resolve, offered them bridges back to honesty (*See* ¶ 66, p.19), anchored in integrity, at no cost to them, in spite of wrongful actions they took (*See* ¶ 60, p.19) in violation of contracts that now must be concluded were only meant to deceive (*See* ¶ 63, 64, 68, p.19), while what Janiskee had sought was an amicable way of moving forward without litigation (*See* ¶ 142, p.32).

Janiskee, as practically a professional absorber-for-the-greater-good of drama, worked zealously in his role as a project manager to protect Vertafore staff, Vertafore client relationships, and Vertafore from stresses and disappointments. Repeatedly as his reward for this were unfair punches, metaphorically, from among Vertafore's clientele made-up of America's most famous insurance carriers. Every such incident was caused by leadership choices (*See* ¶ 112, p.26) by which he was left options rooted in only harsh arithmetic, that he conveyed to clients sensitively, taking at times denigration and bullying in return (*See* ¶ 332, p.56).

Yet, on November 2, 2022, viciously Vertafore via videoconference verbally ambushed Janiskee, despite no cited actions he had ever taken that they claimed somehow caused complaints from three clients, *up to a year prior*, none which he had heard firsthand, and for which true fault was with Vertafore management, whose acts against him on these pretexts then escalated to outrageous conduct.

No complaint to Human Resources had been instigated by Janiskee, nor had he harbored any inkling of his becoming a so-called whistleblower. As a ride-or-die openly Vertafore-orange-bleeding loyalist he had never imagined suing, and even now what he wants is harm addressed without harm done to his coworkers.

As it however happens, given his natural project manager ways, Janiskee for his claims can proffer positively unprecedented persuasively powerful proof.

- 2 -

Perplexingly, Vertafore demanded Janiskee sign a theory that he is "combative", which, Janiskee avers, is total bullshit. Janiskee offers as support of his being irrefutably a softie that his favorite movie is *Jerry Maguire*, and that he once rescued an abandoned sick kitten who Janiskee is prepared to testify had him at "Meow".

Not only is Janiskee not "combative", he asserts that to even ponder becoming a technology project manager, not to mention to do it for any amount of time, especially for Vertafore (*See* ¶ 115, p.27), requires a nearly pathological inability to knowingly allow harm to come to the weaker and the innocent, except in strict accordance with validated best practices upon earning all requisite certifications, as is why it will never be said of any jackass who unloads a clip or two into a food court and then offs himself, "He always did run efficient meetings."

Imminently thus Janiskee will be asking the Circuit Court to please place into his non-combative and scrupulously ethical and forgiving 'clean hands', the Santa's bag's worth of legal litigational metaphorical nuclear warheads due him, by freeing him of Vertafore's go-hang-yourself employment adhesion contract various scare tactic clauses, on his separate motioning about this, if for example he now finds upon taking inventory that between 0 and 100% of interactions in his home office were all along recorded on his own equipment and never erased.

That would create a fascinating symmetry in the side matter of recordings Vertafore managers made of him on personal devices, in which was shown that for any such files not on Vertafore's own servers, its official policy is ¯\_(ツ)_/¯, (*See* ¶ 137, p.32) at harm including to Janiskee's name which he intends to clear.

Then we can see if Vertafore is right about Janiskee's tendencies, as if deserving not only his termination by email, not only on the day before Thanksgiving, and on a backdated lie that he resigned as if even to spite him out of unemployment funds, by these steward gatekeepers of thoughtfulness, after they viciously had gutted him of all facts of his real actions (*See* ¶ 126, p.29), and thus of his humanity, for what will be revealed in every instance were acts not of combat, but of love.

- 3 -

**Complaint**

Self-represented plaintiff Douglas Janiskee for this complaint, alleging of his employer, Vertafore, Inc. ("Vertafore") wrongful termination, age harassment, sexual harassment, FMLA interference and whistleblower retaliation, and of Vertafore and its parent, Roper Technologies, Inc. ("Roper"), misrepresentation, conspiracy, breach of contract, promissory estoppel and gross negligence, and of Vertafore, Roper, and Justin Phillips, intentional infliction of emotional distress, and of Phillips, defamation and tortious interference, further states as follows that:

1. There is no other pending or resolved civil action arising out of the same transactions or occurrences as alleged in this complaint.

2. Plaintiff Douglas Janiskee is a resident of Charlevoix, Michigan.

3. Codefendant Vertafore, Inc. is a Delaware-incorporated software provider based in Denver with offices including in East Lansing, MI.

4. Codefendant Roper Technologies, Inc. is the Delaware-incorporated parent company and full owner of Vertafore, with headquarters in Sarasota, FL.

5. Codefendant Justin Philips is a resident of Lansing, Michigan.

6. This Court has personal jurisdiction over the codefendants as Phillips is a Michigan resident and since Vertafore and thus Roper operate in Michigan.

7. Venue is proper in this Court, via MCL 600.1629(1)(b)(i), given actions based on tort with the original injury and all claims arising while plaintiff worked from Charlevoix despite codefendant places of business elsewhere.

8. The Circuit Court has subject matter jurisdiction via Const. 1963, art. 6, § 13, MCL 600.601 and MCL 600.605, and given an amount in controversy via MCL 600.8301 consisting of damages exceeding $25,000.

9. Allegations relate to Roper only where explicit as of Roper, its CEO, its ethics portrayals, or as relevant to Roper influence over Vertafore or over Janiskee.

10. This complaint amends Janiskee's filed complaint dated February 21, 2022.

## Background Factual Allegations

*The Parties, and the Clients Vertafore Cited for Its November 2, 2022 Assertions*

11. Defendant Vertafore is a software solutions and services "insurtech" provider to the insurance industry of purportedly $635 million revenue annually.

12. Defendant Roper calls itself a "diversified technology company", and is a Fortune 500 and S&P 500 component with annual revenue of $5.3 billion.

13. Defendant Justin Phillips is a Vertafore agent and manager and Janiskee's supervisor who at times acted individually as detailed under Causes of Action.

14. Vertafore clients with whom Janiskee has had direct project contact include:

    a. Utica National Insurance Group ("Utica"), an insurance carrier headquartered in New Hartford, New York.

    b. The Penn Mutual Life Insurance Company ("Penn Mutual"), an insurance carrier headquartered in Horsham, Pennsylvania and the owner of subsidiary Hornor, Townsend & Kent, LLC ("HTK").

    c. USAble Life ("USAble"), of parent Life & Specialty Ventures, LLC., an insurance carrier headquartered in Little Rock, Arkansas.

    d. Fidelity Investments ("Fidelity"), of parent FMR LLC, based in Boston.

    e. Trupanion, Inc. or Trupanion Managers USA, Inc. or American Pet Insurance Company (collectively here, "Trupanion"), based in Seattle.

    f. HDI Global Insurance Company ("HDI"), an insurance carrier headquartered in Hannover, Germany with US headquarters in Chicago.

    g. TTEC or TTEC Services Corporation or TTEC Holdings Company, a Vertafore client with global headquarters in Englewood, Colorado.

    h. American Benefits Consulting ("ABC"), an Alliant Insurance Services Company ("Alliant"), with headquarters in New York, New York.

    i. New York Life Insurance Company ("New York Life") of New York, NY.

15. Janiskee is exploring requesting leave for adding defendants from the above.

16.    Janiskee for his projects had contact with client employee agents including:

 a.  Ms. Shannon C. Peck, Senior Vice President at Utica.

 b.  Mr. Robert Skrzypinski, Assistant Vice President at Utica.

 c.  Mr. Lenny Hatzinger, Licensing Department Supervisor at Utica.

 d.  Ms. Colleen Giuliano, an Application Manager at Utica.

 e.  Ms. Amy Bachman, Assistant Vice President at Penn Mutual.

 f.  Ms. Suzie Gallo, Manager of Regulatory Controls at Penn Mutual.

 g.  Ms. Karen Farmer, Senior Licensing Specialist at Penn Mutual.

 h.  Mr. Dennis Brown, a Business Analyst at Penn Mutual.

 i.  Ms. Victoria Clark, a manager at Penn Mutual.

 j.  Mr. Joe Nicholson, Director at the Penn Mutual subsidiary HTK.

 k.  Ms. Nicole Matynka, Senior Contracts & Licensing Analyst at HTK.

 l.  Ms. Emily Connell, Director at USAble.

 m.  Ms. Jennifer Yoder, a Project Manager at USAble.

 n.  Mr. Paul Zipfel, a Solutions & Operations Consultant to USAble.

 o.  Mr. Brian Hardin, a Compliance Analyst at Fidelity.

 p.  Ms. Jodi Hunt, Senior Mgr, Compliance at American Pet Insurance Co.

 q.  Ms. Nini Pardo, a Compliance Specialist at Trupanion.

 r.  Ms. Pam Sampey, Assistant Vice President at HDI.

 s.  Mr. Steve LeHew, Market Compliance Team Leader at HDI.

 t.  Mr. Kent Davies, a Market Compliance Analyst at HDI.

 u.  Ms. Cathy Radford, Senior Licensing Manager for TTEC.

 v.  Ms. Jhonelle Reynolds, Senior Benefits Analyst at ABC.

 w.  Mr. Rocco Volpe, a Corporate Vice President of New York Life.

**Background Factual Allegations**

*Vertafore Staff Roles and the Roles of Vertafore and Roper and Phillips*

17.  Janiskee is a University of Michigan, Ann Arbor graduate who earned praise in the employ of J.P. Morgan & Co. and The Dow Chemical Company and as an entrepreneur from associates around the world, and who:

    a.  Became involved in project management in 1997, though not all such work has been as a project manager ("PM") in title.

    b.  By 1999 was given the title of Project Management Office ("PMO") for J.P. Morgan's Equity Derivatives Group for East Asia in Tokyo, Japan.

    c.  In 2013 interviewed 40 staff of five state government agencies for an investigation of a state insurance agency failed project for which the insurance software vendor was sued for $17 million.

    d.  In 2021 was assigned to observe Vertafore's failed New York Life project.

    e.  At Vertafore was well-liked, as project managers go (*See* ¶ 115, p.27).

18.  Janiskee in March 2021 applied for the *Project Management Professional* ("PMP") certification exam, passing on his first try, on February 27, 2022.



    *18a. Example of Janiskee slacking-off.*

19.  Janiskee's *PMP* certification, from the Project Management Institute ("PMI"), is the most recognized in the industry and PMI's most advanced of its kind.

20.  A PMP-certified project manager is not allowed to violate PMI's Code of Ethics & Professional Conduct for an employer or its clients (*See* ¶ 310, p. 54).

- 7 -

21. Janiskee, 51, is in an *Age Discrimination in Employment Act* protected class.

22. After launching successful businesses in Japan in the 2000s and gaining experience negotiating with national retailers and media, in the 2010s he faced hardship and, with his wife, sought a settled lifestyle in his home state of Michigan, choosing by late 2019 to pursue project management certification in hope of a return to a corporate career, with the job market sudden demand of "The Great Resignation" by 2021 being a miraculous late-life-career-reboot golden opportunity.

23. Janiskee accepted a role with Vertafore that he began July 26, 2021.

24. Facts of defendants herein are as of November 4, 2022 except as noted.

25. Janiskee is or was a Project Manager II reporting from Charlevoix remotely to Mr. Justin Phillips of Vertafore's East Lansing office.

26. Phillips is not a project manager in job title or by any industry credentials.

27. Phillips is a Professional Services ("PS") Senior Manager of "Central Team", comprised of Principal Technical Consultant Mr. David Smith, Sr. Technical Consultant Mr. Anthony Charlier, Sr. Business Analyst Ms. Cynthia Cochran, Business Analyst Ms. Keli Holtman, Project Manager Douglas Janiskee, and October 2022 new hires Mr. DaJon Johnson and Mr. Sean Metzinger.

28. Persons herein at all times except as noted were acting within the scope of their duties for their respective employers, which for Vertafore also includes:

   a. Ms. Maggie Warren, SVP, General Counsel, and head of Cybersecurity.

   b. Ms. Colleen Heathman, a Vertafore HR manager, or, in Vertafore parlance, a "Human Resources Business Partner", in East Lansing.

   c. Mr. Jake Hunzeker, a Vertafore Human Resources Business Partner in Denver and also apparently a paralegal.

   d. Ms. Molly Garrison, Senior Director, Human Resources at Vertafore home office in Denver and supervisor of Heathman and Hunzeker.

   e. Ms. Kristin Nease, Vertafore's Sr. Vice President of Human Resources.

f. Mr. Michael Mulholland, a Vertafore Professional Services Manager and Program Manager who shortly after Janiskee's hiring became the Professional Services "Project Management Office" ("PMO").

g. Ms. Megan Roush, a Professional Services Manager ("PSM") in East Lansing and former lead of "Team Smart" until its 2022 dissolution.

h. Mr. Michael Bergey, a Technical Consultant formerly of Team Smart.

i. Mr. Alex Fischer, a PSM who became Bergey's manager after Roush.

j. Mr. Jon Newpol, Senior Vice President and Vertafore General Manager.

k. Mr. Mahesh Visvanathan, an Operations Vice President.

l. Mr. Maan Thakur, a Vice President for Professional Services and the direct supervisor of Justin Phillips.

m. Ms. Nidhi Saxena, a Director for Professional Services based in Denver and the direct supervisor of Megan Roush.

n. Ms. Candace Adams, Mgr of Account Management, based in Denver.

o. Mr. Jay Davis, Senior Strategic Account Manager.

p. Mr. Parker Davis and Ms. Megan Williams, Account Managers in Denver.

q. Ms. Lisa Duling, an Account Manager based in East Lansing.

r. Ms. Dalen Feigner, a Senior Account Executive in East Lansing.

s. Mr. John Paddock, a Vice President of Customer Experience.

t. Ms. Laurie Reeves and Ms. Shaymar Geller, who work in East Lansing for Vertafore's Sircon Managed Services ("SMS") division.

u. Mr. Dan Kolakowski, Regulatory Compliance Manager.

v. Mr. Robb Conklin-Strohm, a Project Manager in Professional Services.

w. Ms. Elizabeth Gonzalez, a PSM at Vertafore's Coconut Creek, FL office since Vertafore's 2019 acquisition of Vue Software, LLC.

- 9 -

x. Mr. Govindaraj Sandela, a Senior Project Manager at Coconut Creek.

y. Mr. Juan Carlos "JC" Wicke, a Sr. Business Analyst at Coconut Creek.

z. Mr. Ramesh Marni, a Sr. Technical Consultant in Hyderabad, India.

aa. Ms. Rachel Carter, a Central Team Technical Consultant when Janiskee was hired who in 2022 took a BA role on Gonzalez's team.

bb. Mr. Richard Schultz, a Central Team member at the time of Janiskee's hiring who in 2022 was promoted to PSM and is now a team lead.

cc. Ms. Alli Overley, a Business Analyst in East Lansing.

dd. Ms. Elizabeth Wesson, a Senior Technical Consultant in East Lansing.

ee. Ms. Sharlene Timmons, a Project Manager in East Lansing.

ff. Mr. Richard Fafard, a Senior Technical Analyst in East Lansing.

gg. Mr. Brian Rafferty, a Project Manager who resigned in 2022.

hh. Mr. Kerwin Serraneau, a Project Manager who resigned in 2022.

ii. Mr. Mitchell Suchan, a Sr. Business Analyst who resigned in 2022.

jj. Mr. Tudor Big, a Business Analyst who resigned in 2022.

kk. Mr. Vishnu Krishnan, a Sr. Technical Consultant who resigned in 2022.

29. The East Lansing office of Vertafore was once home to Sircon Corporation, known until 2004 as Innovative IT Solutions, Inc., birthed in 1998 from out of Holland Systems Corporation of Ann Arbor, with Sircon in 2008 acquired by Vertafore, which now is headquartered in Denver, and which in 2016 was bought by Bain Capital, from whom Roper bought it on September 3, 2020.

30. Today, the Sirconians in East Lansing do the dirty jobs that power Vertafore, while the Vertaforians in Denver comprise its corporate top officers in charge of accent colors and hashtags and high-fives and showing-up curious, with the Roperians in Sarasota in charge of portraying everything as awesome.

**Factual Allegations of Representations of or by Vertafore and Its Leadership**

*Business Overview, Leadership, "The Vertafore Way", and Vertafore in Truth*

31. Defendant Vertafore, Inc. is described on Roper's website, as, "…the leader in modern insurance technology…" whose "…agency management, ratings, regulation, compliance, data and analytics, and connectivity products streamline workflows…for more North American insurance professionals than any other provider, including more than 20,000 agencies, over 1,000 carriers and 23 state governments…".

32. Vertafore portrays itself as giving special "north star" priority to integrity, making ethics-based appeals in its recruiting materials for example such as with what it calls *The Vertafore Way*, to which a visitor to its website *Join Us* page is directed, telling job candidates that, "We honor every one of our commitments because integrity is important to us. We prove our words by our actions.", and, "We work together as one team, showing empathy and respect to each other along the way".

33. Vertafore also in its recruiting materials portrays itself as if welcoming of ideas for its growth, saying, "We believe great people make a great company! Our fast-paced and collaborative environment inspires us to create, think, and challenge each other in ways that make our solutions and teams better", and, "We work to challenge one another to push boundaries, think beyond the box, and excel as an organization".

34. Vertafore's CEO is Ms. Amy Zupon, who took the role on October 3, 2016.

35. Zupon's bio in *Insurance Business America* says she, "…makes enormous contributions to the insurance industry on a daily basis…", and with Zupon saying on the *Network of Vertafore Users* NetVU.org website, "…I'm extremely proud to have led Vertafore through the process of creating *The Vertafore Way*…", and explaining that its conception in her first year as CEO "…through interactive workshops, focus groups, and round-tables…" was "…a huge milestone in our development…".

36. As part of Vertafore's annual employee performance self-evaluation process, Janiskee, like all Vertafore employess, was told to write—as a mandatory requirement—about the tenets of *The Vertafore Way.*



*36a. Example of what a huge milestone looks like at Vertafore home office in Denver.*

37. Merged with General Counsel Maggie Warren's employment contract tactics, staff enjoy what maybe could be called *The Vertafore NO JURY TRIALS! Way.*

38. In 2019, when a Vertafore East Lansing former project manager said the company had violated her civil rights—and that when Vertafore went through her computer and discovered that she had sent documents to a lawyer about it that Vertafore engaged in retaliatory acts—what Zupon's Vertafore and Maggie Warren did in federal court, in *Nichols v. Vertafore, Inc.*, for illustrating *The Vertafore Way* bit about how "integrity is important to us", was to first play a game as if of chicken—before the suit was then suddenly dropped—with a random smearing of 16 attempted "shotgun" invalidations of Nichols as its excuses for why Vertafore should not be held to account for so ludicrous a notion as that it would ever be engaging in retaliation instead of "showing empathy and respect", given that, as Vertafore so empathetically put it, "...at all times material, Vertafore and its agents acted for legitimate, non-retaliatory, non-discriminatory business reasons, which, regarding any and all of Vertafore's dealings and interactions with Plaintiff, constituted the just and proper exercise of discretion based on all relevant facts and circumstances known to it...if Plaintiff sustained any of the injuries or damages alleged in the Complaint, which Vertafore denies, such injuries and damages were caused in whole or in part, or were contributed to, by Plaintiff's own culpable conduct, intentional acts, or comparative or



*38a. Vertafore image, presumably of Legal Dept.*

contributory negligence...all or some of Plaintiff's purported causes of action are barred because Plaintiff by her own conduct, acts, and omissions consented to and acquiesced in Vertafore's alleged conduct, and because any of the conduct of Vertafore that is alleged to be unlawful was taken as a result of conduct by Plaintiff...Plaintiff has not suffered any damages or injury as a result of any actions taken by Vertafore. If, however, Plaintiff

did suffer any damages, the amount of damages actually suffered by Plaintiff is less than the amount actually claimed, and any judgment against Vertafore should therefore be reduced accordingly...Plaintiff failed to mitigate her damages; therefore, Plaintiff's damages, if any, should be reduced by the amount she could have earned from other employment or income...Plaintiff's damages, if any, should be reduced or offset by virtue of any recovery she has obtained or may obtain from any collateral or other source as a result of any workers' compensation claim, unemployment benefits, disability benefits, or other employment and/or income...Plaintiff's causes of action, to the extent they state a claim, are subject to any applicable damages proscriptions, caps or limitations...Vertafore at all times acted in good faith, and did not willfully, intentionally, maliciously, knowingly, recklessly, or negligently cause Plaintiff harm or violate any law, and has acted in conformity with the applicable laws, and/or has acted with reasonable grounds to believe its actions were in conformity with all applicable federal and state laws", and because, "...Vertafore also cannot be liable or vicariously liable for punitive damages in light of its good faith efforts to comply with the applicable laws...any award of punitive damages as sought by Plaintiff would violate the due process and excessive fine clauses of the Fifth, Eight and Fourteenth Amendments of the United States Constitution and/or the equivalent provisions of the Constitution of the State of Michigan" and that, "Plaintiff has no standing to initiate her FMLA action and no right to any relief..." and that, "...there is no causal connection between any alleged protected activity engaged in by Plaintiff and any alleged adverse actions taken by Vertafore...", and that it, "...reserves the right to designate additional affirmative defenses in the event it discovers additional information that indicates additional defenses are appropriate".

39. What was done to the victim was, for Warren, a *LinkedIn* resume-builder.

## Factual Allegations of Justin Phillips

*Details of Phillips as Savior from Chaos of Said Savior from Said Chaos of Said Phillips*

40. Defendant Mr. Justin Phillips is a technology manager and swell guy who in Janiskee's estimation has outstanding product and industry knowledge, technology skills and client rapport, and who offers value for Vertafore likely far beyond what is possible with mere aptitude at management fundamentals.

41. Janiskee is skeptical that Phillips is capable of management fundamentals.

42. Janiskee came in his opinion to see ultimately Phillips's life and universe and everything as if about what he had conveyed on February 8, 2022 with a story about his dog Beatrice, saying, "She ran away on me yesterday. Well, she didn't run away, she got out. The back door wasn't latched properly. She lays against the two doors that come together and must have pushed one out. And when my neighbor came and told me she was loose…I was like, 'Are you sure it's my dog? It's big, white and black?' He goes, 'I know what your dog looks like'. And, sure enough…he told me she was down one direction, and I went down there, because 

*42a. Allegedly lackluster intellectually Beatrice.*

there's a gully she's always interested in when we walk, and I was afraid that she was down in it and stuck…and we've got a lake, so then I have visions of her in the lake or hit in the road as I'm walking down there, and there's a bunch of kids gathering near something in the road, and I'm like, 'A dead dog!' Because, she's stupid. And she'll run in traffic. But then when I came back, because I didn't find her, he was trying to corral her and…as soon as I yelled her name…her head popped-up, and she came galloping like in a Lassie movie. I couldn't be mad at her because she got out, because the door wasn't latched. In fact, I'll be right back. I'm going to make sure that door's latched…"

43. Phillips finished by saying, "…I'm OCD about it."

44. At Vertafore, Janiskee found himself sabotaged as if for examining the latches.

45. On August 24, 2021, Vertafore projects were explained to Janiskee by Phillips, saying initial contact with clients at the project level is, "…a very interesting meeting for us…because this is the meeting where the (client's) people who weren't involved in the purchase first find-out they have work to do."

46. Janiskee in the meeting probed Phillips for details about this, noting Phillips seemed to enjoy talking, although he said discussion should happen later as Janiskee gets acclimated, with Janiskee in pressing for better specifics saying that he already could envision much of what likely ends-up occurring.

47. The August 24, 2021 talk was initially about project time tracking systems, which Phillips said David Smith better grasped, with Janiskee then asking about PM methodology, to which Phillips replied about tools Vertafore had talked about buying, with Janiskee clarifying his question as about steps and accountability, with Phillips then referring Janiskee to PM Michael Mulholland.

48. Reasons Janiskee gathered from Phillips for how Vertafore could survive what sounded to Janiskee like abysmal project management included that:

   a. What Vertafore calls a project is often more of a process, of product reconfiguring, less akin to developing the Polaris missile—famous for advancing PM practices—and more like assembling sub sandwiches.

   b. Vertafore relies for this on the experience of seasoned veteran staff.

   c. More lucrative than its project fees are its SaaS hosting fees thereafter, making mid-project remedies to poor planning cheap by comparison.

49. Phillips encouraged Janiskee to offer ideas for improvements in due time, saying, "I'm very interested to hear where we could tighten things up and maybe save ourselves grief. And I do agree, communication is where we fall down a lot", to which Janiskee said of communication that, "I think that's all project management is", and that its need comes from that people tend not to invest in the necessary amount of it, continuing, "I would want to be in the middle of as much communication as possible so that I can be sure that a project from start to finish goes as smoothly as I could possibly manage."

- 16 -

**Factual Allegations of Representations of or by Roper Technologies, Inc.**

*The Roper So-Called Code of Conduct and Ethics and its Portrayal to Investors*

50. The President and CEO of Vertafore's parent Roper Technologies, Inc. is Mr. L. Neil Hunn, who took Roper's helm in August 2018.

51. Hunn spoke at the beginning of a set of otherwise canned ethics training videos that Janiskee when he watched it—mandatorily in 2021 and 2022 for testing and certifying—was caused strong feelings, including of his gratitude to be again in a company he fully believed shares his values.

52. What Hunn in his 76-second speech in the Code of Conduct training says is:

> Hello, I'm Neil Hunn. I'm proud to serve as President and Chief Executive Officer of Roper Technologies. I'd like to welcome you to our Code of Conduct and Ethics Training. At Roper, we're incredibly proud of the long-term success of our businesses. Success, especially long-term success, must be supported by a commitment to high integrity and mutual respect for each-other, our customers and our other stakeholders.
>
> To this end, our Code of Conduct outlines a model for the high ethical standards and commitment to integrity that we expect from everyone at Roper. Understanding this code and incorporating its components into your decision-making will help maintain the vital trust we've established with our customers and with our fellow employees.
>
> I want to thank each of you for participating in this training and acknowledging your commitment to our Code of Conduct. I appreciate your commitment to our culture of trust and mutual respect as you engage with your colleagues, your customers, and all the stakeholders that enable you to do your very best work.

53. What Hunn calls the "Code of Conduct and Ethics Training" above refers to online videos and quizzes, which is distinct from the separate written *Roper Technologies Business Code of Ethics and Standards of Conduct.*

54. Hunn's speech however was for checking-off a to-do list item, titled "ESG", for the annual report, for investors, for appearances, as if of having done his ESG duty…for all staff of every Roper entity under the Hunn.

55. Below are excerpts of narrator summaries between scenarios in the training:

> **[Narrator 1]:** Ever find yourself in a meeting where the conversation seems, well, unbalanced? Some people aren't contributing at all, while others are contributing a bit too much? It can be overwhelming to make sure everyone contributes ideas and participates when there are so many different work styles, personalities and skills. But remember, diversity of thought improves overall team performance…here are some tips that can nurture healthy collaboration…Remain impartial. We all have different lived experiences, and those provide invaluable insights…Encourage participation…Speak up. When you see unfair treatment, tell HR or a manager. They want to help solve issues.

> **[Narrator 2]:** …Having different reporting pathways provides you with options, so that no matter the particulars of your circumstances, there is always a way for you to report your concerns. Our organization is here to support you. Please, use your resources and raise your concerns.

> **[Narrator 3]:** It's human to be at risk of ethical lapses. They're like blind spots, especially when you're affected by pressure and stress. Pressure is a part of every aspect of life, but it doesn't have to lead you down the wrong path. Staying on the path of integrity separates success from failure. We want you to make that difference. You're taking steps in your ongoing journey. Trust your instincts. If something doesn't seem right, reach-out for help. We want to hear your concerns. You're not alone when it comes to choosing the right path. We're in this for the long haul. Let's take the right path together.

56. Hunn in the training video demands "…mutual respect for each-other…"

57. Hunn talks of "…high ethical standards and commitment to integrity that we expect from everyone …", and urges "vital trust" with "fellow employees".

58. The training video goes on with narrator statements such as, "Speak up. When you see unfair treatment, tell HR or a manager. They want to help solve issues." and, "Staying on the path of integrity separates success from failure. We want you to make that difference.", and, "If something doesn't seem right, reach-out for help. We want to hear your concerns."

**Factual Allegations Regarding the November 2, 2022 HR Meeting and After**
*The Vertafore "Performance Improvement Process"*

59.   Yet, after about a year-and-a-half working for Vertafore, on November 2, 2022, Janiskee was told in a videoconference ("the HR meeting") via HR manager Colleen Heathman on Vertafore's behalf, that supposedly he had mistreated three clients, with Phillips calling Janiskee "combative" and then Heathman intensely and insistently accusing and invalidating Janiskee.

60.   What was alleged in the HR meeting, no client had ever said to Janiskee.

61.   Instead, what all three clients told Janiskee was that their complaints were due to Vertafore's actions prior to his involvement.

62.   The Vertafore clients Vertafore alleged as complaining about Janiskee are USAble Life, Utica National Insurance Group, and The Penn Mutual Life Insurance Company, or their affiliates.

63.   Heathman and Phillips were initially evasive when Janiskee, from the meeting's start, asked if a derogatory review of him was being put on file, but admitted the "Performance Improvement Process" ("PIP") gets one papered.

64.   Vertafore told Janiskee he had 24 hours to sign a de facto admission of his culpability for, or rather to electronically acknowledge, conduct by Janiskee as if making mandatory that he must "improve" within 30 days.

65.   Managers' pay, like Janiskee's, is tied to year-end performance reviews.

66.   Janiskee conveyed to Heathman that he has no objection to improvement or to discussions in her presence for resolving misunderstandings.

67.   Janiskee conveyed that if the "PIP" is about Janiskee as its subject, then it should not have been initiated without first gathering facts of his actions.

68.   However, despite repeatedly asking for facts of what actions Janiskee had taken to cause any alleged such complaints, *at no point in the one-hour meeting were Phillips or Heathman able to cite even just one.*

69. What was implied as prompting the HR meeting was Janiskee's reaction to unwanted harassing attention from a Vertafore client insurance carrier female vice president when, on October 11, 2022, after Janiskee politely insisted on maintaining their *already three times agreed* communication routes for transparency, Phillips for this reprimanded him.

70. Janiskee, a PMP-credentialed project manager, tried to elicit a meaningful explanation from Phillips of the rebuke, but to no avail.

71. Janiskee ascribed Phillips's lack of further comment about it to a pattern of random non-responsiveness others too had mentioned.

72. Instead, on October 13, 2022, Janiskee was then tasked with setting boundaries with much higher-profile client Fidelity, by Phillips, who painted them as implacable and prone to complain to Vertafore's CEO.

73. Yet, in the Nov 2, 2022 meeting, Vertafore's statements implied any client complaint about him, no matter whatever the facts, must be Janiskee's fault, in this way causing him an inescapable 'double bind' and severe distress for the implications to Janiskee's responsibilities and integrity.

74. In the HR meeting, no facts of Janiskee's actions were ever cited or allowed.

75. Vertafore insisted Janiskee sign a groundless de facto admission of his culpability as if for alleged client complaints despite no cited such facts.

76. Janiskee tried softening his shocked stance by requesting time-off before signing anything, but was given 24 hours to sign and 30 days to improve.

77. Janiskee made clear he has no objection to training or improvement goals, but the ticking clock pressure tactics plus denial of facts distressed him severely, so he initiated a whistleblower complaint and an FMLA inquiry.

78. Janiskee also asked, "Is this being recorded?", upon which Heathman froze and then Phillips motioned as if to his Tascam Mixcast 4, saying, "It is now".

**Factual Allegations of Vertafore Professional Services and Project Execution**

*The Realities of Implementation Efforts for Clients and The Realities of Vertafore*

79. In reality, Janiskee never acted as Vertafore humiliatingly had accused him, as if in a three strikes pattern of violations, of no guideline that can ever exist, to make him as if a technology project manager bad apple.

80. Even had Janiskee erred, which he denies, no material error was repeated.

81. Janiskee in the HR meeting had politely de facto debunked "PIP" motives as if of "improvement" or communication by his sincere offers of cooperation, yet Vertafore kept refusing to allow facts of his real actions any consideration.

82. Heathman for Vertafore mocked and derided Janiskee's whistleblower inquiry.

83. Vertafore does not get to 'PIP' a certified PM for not assisting "project fraud" and "shareholder fraud" it commits, even of a materiality perhaps open to debate.

84. Heathman implied Janiskee is the problem for not trusting what Phillips says.

85. Well, Phillips says Janiskee is too logical for female clients' grasp (*See* ¶ 129, p.30).

86. Phillips on May 9, 2022 said that his project managing can be called 'lying'.

87. Phillips says Vertafore HR uses age discrimination ploys (*See* ¶ 333, p.56).

88. What Phillips said is the age trap, Janiskee had sped right through (*See* ¶ 334, p.56).

89. Janiskee for Vertafore passed a cognitive test that Phillips never took, and also unlike Phillips, a test of his youthfully adaptable and tolerant personality.

90. Phillips in late 2022 hired two staff quite junior to Janiskee (*See* ¶ 27, p.278).

91. Phillips said, on Sept 19, 2022, his staffing costs then caught Heathman's ire.

92. Phillips had thus expanded Central Team's headcount by two in October 2022.

93. Suddenly, from mid-October 2022, harassment of Janiskee became overt.

94. Phillips also said "Strike 1" client USAble's issue is that they are monkeys.

95. Phillips said "Strike 2" client Utica's problem is their Senior VP, Shannon Peck.

96. Phillips said "Strike 3" client HTK "escalated" over Janiskee when in reality they wanted to deal with Janiskee *who escalated them to Phillips*.

**Factual Allegations of Vertafore's Implementation Project for USAble Life**
*Details of Vertafore's Insertion of Janiskee to Project Efforts Already Underway*

98. It was a year prior, on October 12, 2021, that Phillips referred to USAble's Director Emily Connell and Project Manager Jennifer Yoder as monkeys, as part of Phillips describing USAble as a "Kobayashi Maru" client, which if so will make Janiskee at trial the true first in the galaxy to win it and without ever cheating like some (*https://wikipedia.org/wiki/Kobayashi_Maru*).

99. Even ten months later, on August 24, 2022, in commiserating about the innumerable problems of USAble of which however the Janiskee was not one, Phillips said, "We were set up to fail with USAble from day one, that whole relationship...I even had told Candace (Manager of Account Management Candace Adams) that, 'You guys aren't going to succeed. We aren't going to succeed with USAble. We will not make them happy'".



100. Contrary to Phillips's November 2, 2022 words in front of HR, Janiskee was no anomalous source of client ire, with Phillips conveying on February 8, 2022 that Janiskee had been given two clients that, in essence, had by Vertafore been pre-pissed-off.

101. In fact, on September 22, 2022, coworkers honored Janiskee's sacrifice and those of his fellow fallen in a post to Phillips's Central

*101a. May the odds be ever in your favor.*

Team chat—over a month before Phillips's accusations of Janiskee—with Janiskee here pointing-out that "The USAble Fallen" post above is missing a name, as the first project manager USAble had removed from the project was *not* newbie hire Janiskee...it was Senior Project Manager Govin Sandela.

102. Vertafore's remarks Janiskee heard about USAble were, as nearly a rule, derogatory of them for being notoriously difficult, with lots more examples he could offer to jog Vertafore's memory that strangely lapsed November 2, 2022.

103. Regarding anyhow just "escalation", what Sandela on September 28, 2021 told Janiskee was, "They (USAble) don't actually complain anything in front of you, but they always go back on it. So, they always go back and complain. Like, even if we think everything is going fine, there will be something they will be complaining on us, behind us. Like, maybe going to upper manager…So, that was one of the disturbing thing what I had with them, because, if I know before, I can act…".

104. Senior Technical Consultant Anthony Charlier on October 4, 2021 said of USAble, "…this customer is not shy about, when they get to the thing that they don't like, going right up the chain as quickly as they possibly can to change that outcome".

105. Separately that day Janiskee then told soon-to-be PMO Michael Mulholland that he had reviewed past exchanges between USAble and the project team in Vertafore's prior effort for them and noted that USAble's project manager, Jennifer Yoder, had made same-day meeting demands for non-emergencies, with Janiskee asking Mulholland about expectations in this regard, saying:

> JANISKEE: My intention is that everything I do with the customer is going to be with a smile, and sweet, and in as smooth a way as possible, and, however it's done, it's always going to be with the end in mind of making them happy.
>
> MR. MULHOLLAND: Right.
>
> JANISKEE: I don't think having them do it their way makes them happy.
>
> MR. MULHOLLAND: No. Jen is absolutely a micromanager. You will absolutely need to set expectations. If that request had come to me in the time that I had been there, the immediate answer would have been, "I will check calendars and let you know our availability", not, "Yes, we'll get on a meeting."

- 23 -

JANISKEE: Right.

MR. MULHOLLAND: Under no circumstances does the customer get to dictate when and who comes to meetings.

JANISKEE: Sure.

MR. MULHOLLAND: That is a collaborative, you know, "You can tell us what the severity of it is, and we will try and move with all due haste", but, not only do you not get to dictate that, but they also need to understand that they are not the only customer. If they want that level of hands-on service, they need to work with (Acct Mgr) Lisa (Duling) to pay for a dedicated Professional Services team.

JANISKEE: Okay.

MR. MULHOLLAND: And not that I'm telling you to jump in the fray to be confrontational, but that is a very clear "boundary lines have been broken again" situation. And so, you know, one of the things that you might be able to bring-up with them is just, you know, we had a communication plan in place back in January, perhaps that's worth revisiting, just with Jennifer. You don't need to, that doesn't need to be a whole team thing, but just, you know, "Here are the types of communications that we'll have. Here is the turnaround



*105a. Mulholland and Janiskee on Oct 4, 2021.*

time. I will do my best to respond to, um, I will acknowledge that, you know", you can say, "When you ask us questions, I will acknowledge that we have received them and I am working on getting answers. I will respond within 48 hours whether I have an answer or not, I can say, you know, 'Hey, we are still looking into this', or 'Hey, here is the answer' or 'Perhaps we need a meeting to get further clarification'." But, just that sort of thing can all be documented. And there is a communication plan template out on SharePoint, very straightforward, nothing special, but it will give you a place to start from, if you'd like. And, I would re-document all of that.

106. Janiskee in this way often in Vertafore internal discussions explored worst-case scenarios of boundary-setting with notorious clients, not out of a desire for conflict, but of steering clear of it while delivering competence, given others' decidedly negative experiences that were being relayed to him.

107. Charlier in the October 4, 2021 conversation said of a prior Vertafore project effort for USAble that, "...the project was poorly managed, expectations were poorly set, and the client's understanding of what we were going to do for them versus what our understanding of what we were going to do for them was never clear, and so it set us off on a bad foot where we were basically chasing our tail, trying to solve problems because they were never presented initially, or the client changed scope midstream and then pushed back on us, and instead of us pushing back and saying, 'No, that's not our problem to solve, that's yours', we capitulated".

108. What the PM who immediately preceded Janiskee for the USAble project, Robb Conklin-Strohm, had told Janiskee on September 29, 2021 was that, "...when (a former Vertafore Professional Services Manager ('PSM') named) Tracy was the manager, I needed and wanted her to be more involved, and she was not. And she often did not know what was going on, because she did not come to enough of the meetings to get a clear sense of where we stood with things. And so when we were all meeting, or when, even worse, when she met individually with USAble in some sort of an escalation type of a call, she didn't have the information she needed from the team in order to make an appropriate decision", explaining that the PSM attached to the project plays a crucial role particularly when the client chooses to escalate—meaning chooses to go above the project manager's head—saying both generally and of USAble that, "...they will inevitably escalate things. And that just happens on any project."

- 25 -

109. Conklin-Strohm said, "...USAble isn't a big account, but, like a small dog, they think that their account is probably bigger than it is", and about Jennifer Yoder that, "Jen will always take whatever you give her", and, "...my recommended approach with her is that everything is documented. Like, even though you guys will have calls, you know, have follow-up notes...published on Basecamp..."

110. Conklin-Strohm elucidated a source of tension as that, "You're going to find that Sales at Vertafore is always going to say 'yes'. And they're always going to, quote-unquote, 'sell' something without knowing the full capabilities...So, they sell something, and they promise something, and then we're always in a pickle on the Professional Services side..."

111. Conklin-Stohm said that once the project is handed-off from Sales, the customer needs to be made to recognize that Sales is not who they should be going to for answers, saying, "We had to establish that when I was on the project as well as, 'Hey, I'm going to be the point person, and if you have questions, they need to come through me'..."

112. Commonly expressed in Professional Services about USAble's attitude was also that Vertafore bore blame, for the Vertafore way of buying competitors to keep themselves the market leader, to then do a poor job integrating the acquired firm's strengths, or to tell acquired clients like USAble—who until March 2019 were clients of acquired firm Vue Software LLC.—that they had no choice but to switch to Vertafore's products.

113. What Principle Tech Consultant David Smith on September 23, 2021 had told Janiskee was, "...we sold USAble on the Sircon vision...and the whole spiel, right? And then, in our typical fashion, we don't have anybody to do the work...They (USAble) finally escalated way up the chain. So, we had to do something. And that something was Tracy and I were...having meetings with them...because they're trying to design their whole process instead of really asking us how things should work."

114.  Smith continued, "…so we're coming-up with ideas on how to put those into the system, even though we know that's a really, really bad idea, probably because Sales did their thing" and, "…when you get people like me who go to these meetings, I'll say, 'No, it doesn't work that way', I usually get very much scolded afterward. 'Hey, you can't say it like that. You have to say it in a positive spin.' I'm not a spin guy. 'No, it doesn't work. I'm going to tell you it doesn't work, because, I know what's going to happen'…"

115.  Dysfunction Janiskee had observed of a Vertafore project for New York Life was visible to him as he tried getting clarity about a demo USAble wanted, when the Professional Services Manager ("PSM") assigned to the project, who was not Phillips but PSM Megan Roush, said on September 27, 2021, "…if they're adamant about the demo, Lisa (Acct Mgr Lisa Duling) can work it out through whatever contracting she needs to do that would be a paid engagement for us…", with Phillips replying, "…Megan, we can't really do it



115a. Janiskee being all combative-like, Sep 27, 2021.

without doing all the work, so I'm not sure what the paid engagement would be", after Business Analyst Keli Holtman had said, "Lisa said that they were very adamant that they were getting this demo and they wanted it within the next day or two", to which Charlier replied, "Yeah, they're not going to get it, which I tried telling them. They just don't want to hear it."

116.  As Holtman the BA, Charlier the TC, Roush the PSM, and the Senior PSM also known as JP all made intelligent points, Janiskee the PM was thinking, "Sure, but if I get confronted right now by the client, what's our position?"

117.  Conklin-Strohm however told Janiskee when they met that, "…you'll find that Megan, Megan is doing this correctly, in my opinion, in the sense that she will say if something goes out-of-scope…She's very driven by that."

**Factual Allegations of the USAble Project's Kickoff Meeting and Aftermath**
*Continued Details of Vertafore's Rending of Janiskee for USAble...Disabled*

118. Yet, after 14 pre-launch internal meetings for his learning USAble needs, Janiskee after just 30 minutes with the client was told Vertafore's Nidhi Saxena, whom Janiskee has never met and who never asked for his input, removed him from the project, to suit USAble preference, according to Phillips.

119. Phillips said on October 12, 2021, "We run into that from time-to-time. There's nothing you can do about it. You aren't the first. The other thing is, as I said to them (Lisa Duling and Acct Mgt Manager Candace Adams), 'Look, he's not the first PM they've wanted off their project. They wanted



*120a. USAble's Emily Connell interacting with Janiskee four minutes prior to the end of the October 11, 2021 meeting, about the project's challenges, raised by Janiskee with humor for chemistry that Vertafore aided sabotaging.*

Govin off their project too. So, you've got a bit of a customer issue here'."

120. Phillips said of a recording of the USAble meeting from the prior day that, "The 15 minutes they had, the portions that they were concerned about...I said to the internal team, 'I saw no visual cues or responses that would have told me, if I was Doug, that they had any problem with what was said'."

121. Phillips said, "I think they wanted Rob", and, "Jennifer is the one that said she wanted Rob. And I think that there's a reason that she wants Rob. Rob won't tell her she needs, that we need to put some constraints on things in order to deliver in a reasonable time. Rob will just keep saying 'yes' until we don't deliver. So, and I've already said that. I said, "Look, you're going to have a problem with delivery on these folks because they're just going to keep spinning, which, Anthony has said that." And, "So anyways, I don't want you to take it too personally. I do want to, you know, did want to provide you with, "Hey, this is, this is probably, this is probably one out of five customers that we have, that have some prima donna bullshit going on."

122. Phillips said USAble's wish did not threaten Janiskee's job, since, "There is nothing there Doug that's HR-worthy. So, anybody wants to come to me with that shit, and, well, they would have to make that decision on their own."

123. Phillips said, "...I know Anthony, if he had seen anything that concerned him...actually my comment, was, 'Wait, they've been working with Anthony... and they have a problem with *Doug*?' And, nothing wrong with Anthony, but, he is just sometimes blunt as a, as a box, as a bag of rocks, or, or doorknobs."

124. Phillips said, "...in my view, I have seen this dozens of times, people will take more bluntness from a technical resource. You've listened to Dave tell Gus (of New York Life), 'Gus! Gus! No!', and Gus is like, 'Oh, okay, Dave'."

125. Phillips in the October 12, 2021 talk continued, "...I would have fired your ass if you had said something horrible, but you didn't...I'm trying to be reasonable because the situation calls for it. It's, in my opinion, they are, they have not been properly handled. And, even Nidhi, a while ago, I believe it was Nidhi, she said, 'I don't know why we're not leaving them on Vue.' So, we have known this is building for a while. So, it is what it is, man. They like (Sr. Business Analyst) Mitch. I think that they're angling to try and get Rob back. They're trying to put us in a, my personal position is, they're trying to put us in a box, hoping to be able to get Rob back, trying to stick us in that box trying to get back the person that they like. And, I don't know if Rob actually likes them or not, but I don't know that Rob is able, Rob is able to handle them, given that he now has three young children and his wife died of cancer, I don't know if their level of, level of stress is a thing that we should ask of Rob", and, "...I feel bad for the next PM, so, you know, maybe, maybe you just dodged a bullet."

126. What Phillips told allegedly combative Janiskee on October 21, 2021 was, "...thank you for listening. Thank you for having a grown-up conversation about this. That is not always people's response."

127. Janiskee appreciated Phillips's show of empathy in the October 12, 2021 meeting, with Phillips saying of what Janiskee had tried—joking with USAble about tough choices and the "build versus buy" eternal IT dilemma—that, "…I'm absolutely there with you…Jon (Newpol) is starting to get there, because he's seen all of this. I mean, he actually called Sales out in the most recent Town Hall, of, 'You guys have to start selling what we do', which is progress, and it's better than what I've ever seen before. But, we're broken. And so, you're not wrong…we could provide the feedback and hopefully someone higher-up will win it, and Mahesh and Jon, I think, are starting to see it…because, you're right, we set expectations with customers through not setting expectations with customers, that leave them unhappy with us."

128. Phillips continued, "I think one of the other issues is, Doug, I think in your career, and, this was a concern early-on, but…I think you might have too many experiences for [laughs], you are a big thinker. You're the type of person who should probably be…in a director or higher position…and you're trying to have that conversation with people who don't want to think like that…You're talking, you're talking about concepts and best practices, and so many of our customers are so mired in, 'I want what I've always done but now electronic', that you can't get them to think like that. And it's a challenge, because, I have the same challenge…and so when I was listening to you, I'm like, 'I know what he's trying to say, and if you guys would think about it, and really think about what's in your best interests, but you're not able to'…I think that you overestimate other people's IQs."

129. Phillips said, "…about 20% of our customers are Jennifer Yoders", and of Janiskee's PM approach that, "…insurance licensing departments are highly run by women, so your logic is not, so logic is not going to be a key."

130. Phillips continued, "Look, the Paul guy (USAble contractor Paul Zipfel), he was right there with you on the topics. He was like, he was comfortable with what you were saying and stuff like that."

131. In the October 12, 2021 meeting Phillips confessed to a proclivity for issuing unsolicited advice lacking any basis in reality, saying, "One of the things you'll learn about me is, it's not a statement of, 'I distrust you', it's, I have to get those words out of my brain, because otherwise I'm worried I might be putting you in a bad place if I don't make that warning and you didn't think about it, even though I know you're a perfectly grown adult...it drives (my wife) crazy that I do that. All right? So, please don't ever take that personally", which Janiskee did not, until November 2, 2022.

132. Phillips continued, "What I have found is, throughout my career, I failed a lot when I tried to lead people to the big ideas...So you have to lead them to their feelings. So, they have to like you first, so that they're invested in you. And then you can talk to them like, you know, like I did with Rocco. Rocco and I had a conversation, and for two weeks, he was a better person."

133. Contrary to Phillips's portrayals 13 months later in front of HR, that USAble's request was clear, thus Janiskee must be to blame, and is a my-way-or-the-highway insufficiently soft project manager, in reality Janiskee expressed wanting to try getting USAble to reconsider, but Phillips said that because they had articulated a clear request, Phillips intended to hold them to it, and not let Janiskee go to them on bended knee, saying, "Well now that they have said that they don't want to work with you, I would fight tooth-and-nail to not set you up to fail", and that, "...they don't see this as a two-way street, and so you couldn't win" and, "The AM (Account Management) team has decided to let this be a thing...I gave them a perfectly fine PM."

134. Phillips said "...it tells me a lot when I discover that you're not the first PM they've (USAble) asked to be taken off the project. That tells me that they care more about...their perceptions than they care about the success. And they don't even realize that. And that's the thing. You can't be mad at people for being like that. They don't know that they're that way. They truly believe that they're a fully functional human being and not a monkey."

**Factual Allegations of Vertafore Invalidation, Obfuscation, and Retaliation**
*The So-Called Whistleblower Process*

135. After the HR meeting, Jake Hunzeker on November 3, 2022 5:33 p.m. contacted Janiskee indicating a talk was needed about his whistleblower complaint.

136. Hunzeker implied the Nov 2, 2022 meeting Janiskee wanted to discuss was a different or wrong topic but that he may raise it "if there is relevant info".

137. Hunzeker also claimed the Nov 2, 2022 meeting recording Janiskee had requested was, according to the two other attendees, never created at all.

138. The invalidating by Hunzeker and stunning false claim that no recording was made vastly worsened Janiskee's now debilitating emotional distress.

139. Janiskee had requested time-off, thinking five weeks yearly PTO to be the norm, but Heathman was dismissive when he asked for guidance about this.

140. Though fearing repercussions, Janiskee also inquired about FMLA options, ultimately receiving however no information from leave administrators in reply.

141. Janiskee had acted to ensure his projects could progress without him.

142. Stunned at bonuses, raises, promotions and job security put at risk by false portrayals by Heathman and Phillips, while what seemed like The Hunzinator showed only alien robot incuriosity about whatever he raised, Janiskee proposed HR cancel its derogatory process, saying he just wants to work.

143. Janiskee on Nov 16, 2022 resumed treatment for effects of emotional distress.

144. On November 21, 2022, Hunzeker made contact to arrange the talking-to, but when Janiskee went to reply, he found in his personal email inbox an unclear auto-generated notice, of 3:34 p.m., implying he was terminated Nov 4, 2022 and that he knew, with a link to details, to which his access was revoked.

145. On November 23, 2022 Hunzeker wrote to Janiskee's personal email account to tell him Vertafore deemed him resigned, to which he replied is false.

146. Janiskee on Nov 25, 2022 was not paid, and got on Dec 3, 2022 his first official-ish notice of termination—that his medical coverage ended Nov 4, 2022.

### Factual Allegations of Janiskee's Inner Thoughts and Motives
*When Codes of Conduct Proved of No Help*

147. Never did Janiskee consider quitting Vertafore, choosing always to persist, such as at earning trust, and believing he can surmount any challenge.

148. Janiskee visibly had invested care in his relationships with his coworkers.

149. Janiskee never refused communication, even as Vertafore acted to obstruct it.

150. Janiskee post-"11/2" kept emailing, to a Phillips he never heard from again.

151. Janiskee missed no compulsory Vertafore meetings.

152. Janiskee without prompting ensured his work responsibilities were covered.

153. If Janiskee failed to cover any responsibilities, such was only of a minor or common or inadvertent nature and within the bounds of common practice.

154. Janiskee until October 31, 2022 did not try gathering wrongdoing evidence, capturing conversations only in pursuit of mastery of his role, particularly after Michael Mulholland on September 23, 2021 said, "...Dave (Smith) is one of the most knowledgeable people that we have within Professional Services...so definitely lean on him" and that he "...does not enjoy repeating himself" and that, "...when you go to him for help, make sure that it's not something he's told you before", mostly leading Janiskee to leave Dave alone.

155. Janiskee at times documented discussions with help via the popular Windows audio editing application "Audacity" which can typically record either device audio output or microphone input but not both, with Janiskee as the sole intended audience not needing to replay his own words to himself anyway.

156. Janiskee at the same time came to see some of Phillips's behavior as akin, in his opinion, to that of a would-be popularity contest winner, incompatibly with management fundamentals, or even like of a would-be cult leader.

157. Reasons Janiskee thought Phillips to be like a would-be cult leader included for example that Phillips often said that if he could he would be a cult leader.

158. Janiskee though has both people skills and will to uphold ethical boundaries.

**Factual Allegations of Leaders of and Representations by Vertafore and Roper**

*Roper Reconsidered*

159. Janiskee however was caused to re-assess his entire experience of Vertafore, given his shock, ultimately from his having trusted Roper's Hunn's portrayals.

160. Hunn in 2018 had apparently taken over from cancer-stricken Roper CEO Brian Jellison, who passed away two months later on November 2, 2018.

161. Roper under Hunn by 2020 was the most profligate spender in the S&P 500 on what in Janiskee's layman opinion seem indistinguishable from fully fabricated empty assets, albeit fine apparently by GAAP.

162. Roper balances this with competitive strength in lobby niceness and logo size.



*162a. Hunn in ethics video talking about integrity, apparently while waiting for the next elevator.*

163. CEO Hunn for Roper is better at making money than Buffet.

164. The Savant of Sarasota consistently outsmarts the market.

165. Hunn's compensation is more than of the CEO of Eli Lilly.

166. Hunn says he prefers acquiring asset-light niche tech firms, which he seems to portray essentially as if cash faucets.

167. Yet, Vertafore insists it must be Janiskee who causes its clients' bad moods.

168. Janiskee says the evidence shows the more likely culprit to be Amy Zupon, Vertafore's CEO, whom he asserts...*Chiefly Exits Officers.*

169. At Vertafore it is not cream one sees rising to the top.

170. Vertafore reacted as if talent fleeing upon seeing a way out was just trendy.

171. For Janiskee however, Roper's ethics portrayals caused him to be dismissive of what in his opinion were red flags, in especially his manager's behavior, which finally he voiced more clearly after October 31, 2022.

172. Notions Janiskee had been led by Vertafore's Zupon and Roper's Hunn to believe of how he would be treated if caught in a dilemma in upholding his complexity-fraught duties had apparently all been a sham.

173. Because, what The Talented Mr. Hunn forgot to mention in his speech is how ethics-schmethics is a 'not-my-job' thing apparently, rationalized in his words as, "leveraging our decentralized operating model".

174. Janiskee wishes he'd known when listening to Hunn, in his posh lobby, in front of a persuasively big logo, that leveraging decentralization, as taught to Hunn presumably at Harvard, is seemingly Roper's only theme, as if its tagline, since Janiskee with his mere public school degree from down the road in Ann Arbor failed to intuit this advanced concept.

175. If given Hunn's job, the best wordings Janiskee could have come-up with would have been, say, "Roper: Leveraging Forks to Serve You Pea Soup", or, "Roper: Leveraging All of Us Gently Blowing on Cats for Herding Them", or, "Roper: Leveraging Words as a Surefire Way of Hiding That We're Idiots".

176. Yet, Janiskee has no evidence of Roper as corrupt beyond its ethics training sham cult tactics that cause him ongoing pain versus Vertafore's truth, only knowing Roper seems to love its lobby and big logo, and in October 2020 that it paid $5.4 billion for Vertafore, to those Bain Capital eternal suckers, who four years prior paid for it half that, and made these improvements:

## New logo installed atop Denver Place North Tower

Brendan Pedersen    August 9, 2018    0



Vertafore's new sign was installed this week on top of Denver Place, which overlooks 18th Street downtown. Photo: Brendan Pedersen

Signage for Vertafore, which moved its headquarters to Denver last year, now graces the building.

Corporate Interiors

## Vertafore – Denver Office



Howell Construction was hired to complete a corporate interior renovation for Vertafore Inc. Howell worked closely with Vertafore, DLR Group and CBRE throughout the design phase by providing the team with cost analysis for specified scopes of work in the DD and CD stages. Project scope included private offices, huddle/conference rooms, open office space, training room, library, breakroom/bar area, temporary office space and restrooms.

The design of the space incorporated custom millwork, reclaimed wood paneling, polished concrete floors and glass DIRTT partitions in order to meet the client's vision of a modern tech space that not only celebrated current employees, but provided a space that would attract top talent to their growing operations.

a. Now *that's* a persuasively big logo if ever there was one, supposes Janiskee, and a nice lobby too, though he prefers Roper's, for being not as seemingly just slapped in place as if in a rushed job by the crew of *Bar Rescue.*

b. Of course, Janiskee is not implying that Bain Capital did nothing more than this, or that Roper only looked at logo size and the lobby and decided then on a tagline of:

c. "Roper: Leveraging an Extra $2.7 Gigabucks for a Big-Ass Logo and an Ikea-Furnished Lobby at Exactly the Point in the Pandemic When Everyone Realized That Nobody Will Be Willingly Working in an Office Tower Ever Again".

d. Of course, Janiskee's true concern is about much more than this.

**Factual Allegations of Roper Decisions Impacting Vertafore**

*Realities of "Asset Light" and "Niche" and "Tech" in the Case of Software*

177. Although for Janiskee as a project manager to claim to be popular among Sirconians and Vertaforians would be akin to if Michigan Courts claimed to be a popular judicial system among the incarcerated of our state, Janiskee was held in high enough regard among internal stakeholders that insecurity about this by his manager—which Janiskee tried hard to avoid causing—can be shown with overwhelmingly utterly boring evidence to have contributed to de facto retaliation.

178. What his manager in Janiskee's opinion mostly displayed effort at was as a would-be popularity contest winner more than what is really managing, at least of the kind in which effort at the managing makes the managed thing then more actually manageable other than to solely that one manager, which is not to imply Justin Phillips as other than truly vital.

179. This was despite that Roper had talked to Vertafore about "repeatability", which on hearing this evoked in Janiskee nostalgia for all things pre-1994, like *The Six Sigma Way, The E-Myth Revisited,* and *Whoomp! (There It Is),* like if people from a pre-juice era warped to 2022 and advised Tropicana to focus on juiceability, or in the SaaS era like advising a waterworks to get women who carry all that water to customers on their heads to do it within Masaai variances, using the terminology of an asbestos-spewing industrial dinosaur to describe what for the context of this century for a software company is actually "strategy" and "processes".

180. What Janiskee learned as an entrepreneur via successes and failures, as is the more normal pattern than of Hunn's who apparently was born with business all figured-out, in what for Janiskee was like working through the pages of a business-textbook-come-to-life, was that the title of his Chapter 1 was, "No, You Cannot Delegate Final Accountability, But Nice Try, Doug!"

181. In reality, clients were angry *because Roper caused Vertafore talent to quit.*

- 37 -

182. Janiskee is caused emotional distress because it would be as wrong for Vertafore to now scapegoat Phillips for all allegations herein as it was wrong for Vertafore to scapegoat Janiskee on the scapegoating words of Phillips.

183. Because, Phillips on November 2, 2022 had made clear as a reason for his conduct that, "…leadership is asking questions…".

184. Janiskee wants damage undone and better outcomes for his coworkers and even bosses but has no personal vendettas.

185. Janiskee told Phillips on November 1, 2022, in discussing the upcoming HR meeting, that when Phillips is having apparent bouts of anxiety, that Phillips has a tendency to literally start making stuff up.

186. Pressure causing Phillips's crackin' up, or his empire-building, or sabotaging, starts with tall tales told by CEO Hunn.



187. Roper under Jellison said its success was in "asset-light" acquisitions, but even so with Roper still about mostly hardware back then.

188. Jellison's approach was questionable even in Jellison's day.

*189a. Roper's pie-in-the-sky skips but one slice.*

189. Hunn applying Jellisonian notions to Vertafore causes calamitous results that Janiskee observed of Vertafore's project for New York Life and others.

190. Roper, in talking-up its stock, skips past its new reliance on *uber-niche talent*.

191. It takes ten years to grow a confident true veteran Sirconian.

192. Janiskee investigating talent bottlenecks led to retaliation.

193. Making Janiskee on no facts subordinate his credentials and judgment to the Hunns or the Heathmen opens paths to "project fraud" and "shareholder fraud".

194. Janiskee on November 12, 2021 had non-combatively questioned the procedure of his rote signing of estimates for which he had limited details.

195. Phillips replied in agreement, in principle, that the arrangement was not ideal, saying of recent Accounting discussions about planned changes to the process that, "…we are asking the PM to say, 'Yes, this is the number of hours that were spent and this is the number of hours I think are going to be left' and attest to that, and they keep using the term, that the PMs are doing an 'attestation', which is a legal term, and I never like to hear legal terms from people like that, because that implies some sort of, 'You shouldn't pencil with it', because, that's saying, 'This is important.' This is, you know, 'We're making financial representations based on your information'."

196. Janiskee was thus already making de facto 'attestations' in complying when told to approve under his own name estimates handed him from Sales after input from Michael Mulholland and often other project team members, with Janiskee by then at three months of Vertafore experience accepting that the numbers were likely well-vetted, except that he as PM was signing-off on assumptions he might not know how to defend if asked.

197. David Smith too agreed in principle with Janiskee but questioned how a Vertafore mere Project Manager II could have any estimating say in practice.

198. Janiskee by February 7, 2022 would be required by circumstances to demonstrate PM proper estimating to the disbelieving Sirconian natives.

199. Phillips said, "…with your desire to see us do it better…I'm probably going to volunteer you to be part of whatever group…to try to figure-out how we're going to do this…because…I'm not, I'm, yeah I'm a dick I'm going to admit it—I don't feel most of our PMs understand the concept of project management", to which Smith said, "That's not a feeling…that is a fact".

200. In a March 23, 2022 "town hall meeting", Vertafore SVP and GM and plausible James Cromwell vocal impressionist Jon Newpol, who is in the long chain of leaders in-between Roper shareholders and a lowly PM's existence in a cubicle far, far away, took staff questions by which Newpol's replies say much about why Janiskee is now telling a court of law that Vertafore and Roper angered Vertafore clients yet blamed Janiskee, with "leadership" seeming fine to let Janiskee and his family take the fall for them, with actually Janiskee supposing Newpol the least worst of their lot, who perhaps was hopelessly hamstrung by others when seemingly pointlessly he blathered:

> Alright, so we already have a few questions...so let me dig into a couple of those...alright, "Here we are already in mid-March, almost in April, and we haven't even had a chance to sit down and talk about compensation with our manager (to) set next year's performance objectives. Why is it so late?"
>
> Yeah, I agree. I think all that stuff could be done sooner. I mean, at some level, there is a rationale. For the timing of things, there's just probably a lot of other competing priorities. And in some ways, you almost have to start getting into the year, and understanding the expectations and, you know, at an organizational level, and let that manifest into what departments expected, and how that turns into individual roles and responsibilities, expectations. I don't necessarily think that all of that has to be linked to hearing the performance review from the previous year. I do think there's a difference between sort of like how an individual performs compared to their goals, versus what is expected in terms of a roles contribution to the overall success. Although there is a linkage there, I'm not trying to downplay that. I do think there's opportunities, obviously, for learning more about what we can put in particularly in that development section, if there's anything that individual needs to do better. So I'm not skirting the issue in any way, I do think it could be sooner. There's a cadence to it, there's some rationale to it, but we need to do it a little sooner.
>
> As far as the compensation stuff goes, again, there's some caveats to that too, you have to sort of get things finalized, ap-

proved by, you know, corporate here approved by Roper, etc. Took a little longer, but I think we're in a position to start having those conversations very soon. So if you're frustrated by any of that, that's all going to happen in the near-term now. So hopefully, we can put that behind us, be excited about where we are. And maybe, like you said, learn some lessons, to be more timely next year.

Um, question around customer satisfaction with implementations. That's a little bit of a different, difficult one to answer, because each customer has a lot of unique issues. But if I was trying to put some themes down for what's causing some of that, I would say it's sort of related to some of those churn issues, you know, some of the new product capabilities and customers wanting more aggressive innovation as part of their implementation. Sticking to timeframes, sometimes, you know, they're raising issues about what they want changed in terms of what we were expecting when we set up the implementation timeline, but they still need it done within a certain timeline, even if they've sort of expanded scope. There's an element to just, you know, team experience, and, and you know, the amount of time that our own team members have to spend on it. So, there's a lot of dimensions that, that play into that. And we're, we're, we're paying attention to that we have routine meetings to try to, like, delve into some of the underlying issues and what we need to do as a team to address them. But the interesting thing I will say, just to sort of close-out that question is, we work with large customers, right? The fun part about our organization, is that we work with the biggest customers in the industry. And that's, you know, like a blessing and sometimes a curse too, because they're used to getting their, their, their way, right? They're the 800-pound gorilla. And so when they make demands and add on us to sort of reconfigure the product or reconfigure things, you know, specifically for that their needs, and we don't move quite as nimbly as maybe we should, or that they'd like us to, that can create some frustrations too. So a lot under that question, but thanks for asking.

201. A problem with the above is that, although Newpol seemingly throws Hunn correctly under the bus—as if not just a Pinocchio about ethics portrayals but a foot-dragger on staff pay too—the remarks came during a talent mass exodus from a low-paying Vertafore critically dependent on super-niche expertise.

202. Janiskee on at least three occasions took initiative beyond the expectations of his role to investigate staff allocations issues from leader inattention, as clients got impatient, with his efforts seeming to elicit Phillips's insecurities.

203. Janiskee on April 28, 2022 asked in the weekly Tech Meeting about project hours allocations seemingly mathematically unworkable in the real world, soliciting insights in what soon became an engaging discussion, such as with Senior Technology Consultant Vishnu Krishnan, who that week was leaving as part of the exodus of top talent, saying:



*204a. Roper partnership (dramatization).*

>    …the final straw for me was, like, working with Michael Mulholland, when he allocated me as, like, 150% for all the projects that I was working on. For like every week it would be, like, 150 to 200%. On top of that, support tickets and everything. And then he would schedule, like, he would ignore all my PTOs, and schedule all my deployments everything the week after or during the week of PTO. And I'm not sure exactly, I'm just assuming, because he was friends with Cassie, Cassie was not able to say much to him. But, I was very vocal about it. I wanted him off of the project, because he was the one who was causing all the issues. When he was gone, Cassie was able to re-implement that, saying, like, I should be allocated only 80%, not more than that. And also I was protected from others.

204. Janiskee holds Mulholland in high regard and suspects there is more to this one story than relayed above, but that anyhow Phillips and Heathman, in citing Mulholland on November 2, 2022, were window-dressing to hide that they may as well have been punishing Janiskee for his belief in math.

205. Phillips on May 12, 2022 disinvited Janiskee from the weekly Tech Meeting as being only for Techs despite his having always joined without incident.

**Factual Allegations of Roper's 13-Year Easy Money Shell Game**

*Effects on Roper and Vertafore of the 2022 Death of QE*

206. Roper advice did not create Sircon nor is what gets its work accomplished.

207. Compensation-wise, Roper are like America's laziest management consultants.

208. Parasitic M&A activity for no true value-add is a side effect of the Fed's "QE".

209. In 2008 the Federal Reserve instituted "quantitative easing" in response to the subprime mortgage crisis, to be cowed from tapering it off when in 2013 markets threw a "taper tantrum", with rate cuts also in 2020 due to COVID.

210. Our government gifted Roper a 13-year easy money ride.

211. Instead of trickle-down effects, quantitative easing caused Americans to be paying more, for everything, to the already-rich, who kept wages stagnant, as easy money our government made available to the likes of Roper caused Jellison to jettison real accomplishment for a shell game while deciding himself brilliant, to create an America today of stalled innovation and empty ethics huck- sterism divorced of action or facts.



*211a. Roper stock cumulative returns and QE.*

212. QE birthed a new socioeconomic class of self-congratulatory uberdouchebags.

213. In 2022, the formerly "QE-Infinity" Fed was forced to take action on inflation.

214. In 2022, Roper's chief financial officer said, "Thanks, guys! I'm outta here!"

215. In 2022, Vertafore's talent flight came to a boil, delaying projects and intensifying client antipathy for Vertafore, unleashed by some at Janiskee.

216. In 2023, of Roper's massive financial liabilities, $1.3 billion is coming due.

217. In 2023, innovation-choker Roper held its first-in-133-years "Investor Day".

218. On that day, Zupon implied her growth plan is...*Professional Services projects.*

### Factual Allegations of Who Really Polices Ethics at Vertafore

*Anybody Home?*

219. Vertafore's tumultuous environment left Janiskee little choice but to raise ethics issues of Phillips that leaders did not, lest Janiskee too end-up targeted.

220. Janiskee raised ethics concerns for believing the words of Roper's the Hunn.

221. Janiskee raised ethics issues about Phillips only to Phillips, with humor, and framed as about Janiskee's wish to rid himself of bad habits, or jokey ire at Phillips's denigration of project managers, never by being accusatory.

222. Most common of ethics issues was what Janiskee termed "triangulation", meaning really just gossip, particularly if able to motivate sabotage of others.

223. Janiskee said those worthy of gossip should be fired, or if not, then that is a choice too, of giving them full supportiveness, otherwise the problem is us.

224. Janiskee took firm, polite stands on behalf of multiple maligned coworkers.

225. This complaint omits coworker gossip not directly tied to Janiskee's claims.

226. An example instead using a former employee occurred when Phillips, on February 15, 2022—in changing the topic of discussion from denigration of a manager in a different division—had said, "At least he hasn't declared that we're being discriminatory because he's pansexual", continuing that, "That was…Amanda Smith", and that, "She didn't do things properly. There were a ton of things that we tried to automate for her and she just didn't follow-up. So I just wrote to Holly and said, 'Hey, I haven't gotten this back from Amanda, so I'm going to stop worrying about it.' And so then she told Chris that we were discriminating against her because she was pansexual. And Chris goes, he looks at me, he goes, 'Justin, I don't know what pansexual means'…And, you know, me being the individual I am, I'm like, 'She'll fuck anything. That's what it means'.", with the point being about promotions to manager that had been a mistake, which, even if true, suggests Smith, pre-promotion, could not have been purely bad.

227. Amanda Smith, is Amanda Nichols, of *Nichols v. Vertafore, Inc.*, cited earlier.

228. Janiskee did not know about *Nichols v. Vertafore, Inc.* until after Vertafore had so hastily and bizarrely terminated Janiskee, and after he was already deep into writing and researching legal claims in preparation for filing them, and even then had not recalled Phillips's comments about Amanda Smith until later stumbling upon them, to discover that not only was Janiskee's case mirrored in many of the allegations Nichols had made, but that what she had merely alleged, *Janiskee for his case had documented.*

229. Far from Roper merely making sham ethics standards claims for their merely being lackadaisical in ensuring their representations match reality, what Vertafore did to Nichols, via Zupon, Warren, Heathman and Phillips, was known, yet Zupon, Warren, Heathman and Phillips were left to keep at it.

230. For Vertafore to stand against bullying and gaslighting risks their revenue.

231. Janiskee asserts that it takes mental-emotional stamina to endure what Zupon, Warren, Heathman, Phillips and others in the Vertafore chain currently of questionable command can do to a caring employee as if while patting themselves on the back for it, or adding it to their resumes, with it being no surprise now to Janiskee that Warren and Zupon in court threw every excuse in the book at Nichols to try to invalidate her, and with Philips even years later making fun of what Nichols was caused.

232. Janiskee might not have thought Nichols's complaint persuasive had he not himself suffered severe emotional distress caused him by Vertafore.

233. Janiskee was surprised Vertafore could cause him such emotional distress.

234. By the time Phillips was telling Janiskee and the rest of Central Team about Amanda Smith, Janiskee had already raised the issue with Phillips of his badmouthing others...but which Vertafore management kept abiding.

235. Janiskee does not know that the Nichols complaint means that Nichols's manager, Holly Bratt, was "triangulated" by Phillips against her, except that, on February 15, 2022, Phillips's own words seemed to say exactly that.

**Factual Allegations of "Compounding Cash" as if From Vertafore**
*Charting Innovation*

236. Janiskee is not alleging Roper and Vertafore to be less than real businesses.

237. Vertafore's conduct complicated Janiskee's ability to seek help from Roper.

238. Janiskee did not realize certain truths of Vertafore until such was too late.

239. Maybe Roper is naïve and does not grasp Sircon to be a hostage as if of turds, who odiously made claims about "culture" and saluted a logo homage to apparently bad plumbing as Turdafore then flushed Janiskee, to silence him, maybe blocking wind of overflowing smelly schemings detrimentally to Hunn.

240. Hunn tells his CEO underlings, "Just don't lie to me", as recounted on March 21, 2023 at Roper's "Investor Day" presentation.

241. What Vertafore CEO Amy Zupon did at that March 21, 2023 talk, in front of Hunn, maybe harmlessly yet tellingly, was make a claimed 16% increase in Vertafore's giving a toot about its offerings look like a boost in investment of 230%, and claim stunning-seeming 95% "employee engagement" in baldly lying with a statistic made hardly differently from if Zupon had asked



*241a. Vertafore bar chart of its R&D spending, hopefully including on improving its bar charts.*

staff, "Who has not yet committed suicide? Let me see a show of hands!", with then 5% making a dash for the window, being as it was the result of a voluntary survey, thus filtered of the dearly departed and the barely engaged, and with replies of, "Meh, call me 50-50" tallied as "100% Engaged!!"

242. Zupon's apparent plan for how Vertafore as the Soviet Union of insurtech can make Hunn's Vertafountain of eternally-compounding cash nonfiction is consultative services, to its angry clients, by *its uber-niche human assets*.

### Factual Allegations of Ambush Tactics by Vertafore and Justin Phillips
*Supposedly "Things Just Aren't Working Out"*

243. Janiskee was given no reasonable indication of his performance as a problem.

244. Vertafore acted to maximize the disorienting effect of the ambush on Janiskee.

245. Janiskee made financial decisions on feedback that his position or standing were not in any jeopardy due to the incidents of client cantankerousness.

246. On October 12, 2021, when told he was being removed from the USAble project, Janiskee was highly praised by Phillips, who said Janiskee could not have done anything about it, as Michael Mulholland also had conveyed.

247. On February 8, 2022, on being pulled from the Utica project, absolutely no details were provided by which Janiskee could have known how to act any differently, with Phillips saying Janiskee's work for the project merited consideration for company-wide adoption, and even having said just two weeks prior that Utica's negative treatment of him was utterly undeserved.

248. On March 24, 2022, Janiskee during an annual "Performance Review" was told by Phillips that, as a new hire, and given Vertafore's "standard distribution model" statistical approach, that Janiskee, like most of Central Team, would be rated as "Meets Expectations", and that Janiskee within that bracket was being awarded the maximum incentive bonus and pay raise, with Janiskee specifically asking if there were any concerns about him and Phillips replying, "You've worked here long enough to see that we have a lot of legacy issues that we have not, that we continue to try to resolve as an organization [laughs]. So, no, I don't think I have any concerns, Doug. I appreciate that you are concerned, but I really haven't had any concerns", with Phillips then detailing that he does not believe in sugarcoating.

249. On April 4, 2022, Phillips said of their weekly one-on-one meetings that, "...this time is for you, for us to work together. I don't have anything I'm concerned about, and if you don't have anything, I don't want to waste your time", with this too after two of the supposed "three strikes" incidents.

**Factual Allegations of Conduct by Vertafore and Justin Phillips**
*So-Called "Mentoring" and Effects*

250. Janiskee from of the actions of Vertafore and Phillips had become plagued with persistent "walking on eggshells" feelings.

251. Janiskee on being removed from the Utica project asked to be allowed to use some of his paid time off for getting away, which Phillips granted, for a departure to Arizona on February 17 and return on February 24, 2022, during which he also coordinated or attended three meetings for Vertafore.

252. Janiskee then on March 8, 2022 sought therapy, sessions for which began on April 4, 2022 and continued weekly for two months.

253. Janiskee believed his plight at Vertafore would improve with time and trust.

254. What Phillips later portrayed to HR on November 2, 2022 as if "mentoring" had however all along been Phillips assessing Janiskee's vulnerabilities.

255. Phillips did schedule weekly one-on-one meetings with Janiskee, but in which almost no mentoring occurred, with few of Phillips's words being work-related, and with any Phillips might have mistaken for "mentoring" being inconsistent with basic project management and not practicable advice.

256. Phillips knew that, in terms of assets, Janiskee was effectively homeless.

257. Phillips knew of Janiskee's concerns of the inevitable mental health impacts on him of what he considered oppressively dark winters in Charlevoix, Michigan.



258. Phillips knew of Janiskee's concerns about the amplification of this on him by the extended visit of Janiskee's wife home to Japan to visit family for winter.

*260a. Charlevoix typical winter day as seen from the International Space Station.*

259. Phillips frequently talked of "Neuro-Linguistic Programming" or "NLP".

260. Of all times to put Janiskee's livelihood at risk on no facts of his conduct, when he would be least able to respond, Vertafore targeted him optimally.

261. Vertafore and Phillips dealt Janiskee suffering they knowingly maximized, imposing needless ticking clock pressures to denigration built on fictions, culminating in Colleen Heathman's accusations for Vertafore against him.

262. Janiskee by this was paralyzed logically, and thus emotionally too, at no fault of his, given no logical way of doing his job and avoiding punishment.

263. Phillips, Vertafore and Roper had deceived Janiskee into believing his job was reasonably secure, given Janiskee's integrity, Phillip's feedback, and Roper and Vertafore's sham portrayals of their ethics, enough that after years of hardship Janiskee believed debt repayment, simple indulgences, and his wife making-up for lost time with family in Japan was affordable.

264. Janiskee was prepared to survive a job search when he accepted Vertafore's job offer, but not on November 2, 2022 when Vertafore then ambushed him.

265. Vertafore's November 2, 2022 portrayals made Janiskee's job impossible.

266. Janiskee was devastated by the totality of all he had endured at Vertafore, that he had minimized to himself, until viciously invalidated by Vertafore HR.

267. Janiskee tried mitigating effects on him of defendant conduct, needing time for arrangements, but getting therapy and medical care.

268. Janiskee wanted emotional strength for finding solutions to illogical demands.

269. Janiskee asked his doctor for ketamine, having read about its fast-acting antidepressant effects, but was unable to procure a timely solution given also his fear for his job, the economic precariousness of his situation, his wife being overseas with no return ticket yet purchased, and that ketamine options involved significant out-of-pocket expense, yet with traditional antidepressants requiring weeks to take effect in Janiskee's understanding.

270. Vertafore then blindsided Janiskee by cutting pay and medical coverage, with zero warning, starting from November 4, 2022, unbeknownst to him.

271. Janiskee realized this timing when his therapist said coverage was denied.

272. Janiskee's only therapy then was writing what the defendants had done.

**Causes of Action**

Contrary to the accusations of November 2, 2022, Janiskee is not "combative", as will be shown in greater detail in affidavits successively added to the record, forthwith upon their completion, helpfully sequentially codenamed "Little Boy", "Fat Man", "Able", "Baker", "Ivy Mike", "Castle Bravo", "Argus" and "Tsar Bomba".

Janiskee suspects that were he to try to help the defendants show definitively that he is supposedly "combative", and thus needed to be project managing in *The Vertafore Way*, or *The Justin Phillips Way,* or *The Colleen Heathman Way*, or *The Amy Zupon Way*, or *The Larry Hunn Way*, or *The Jake Hunzeker Way,* as opposed to *The Not Committing Project Fraud and Going to Federal Prison Way*, by his offering a representative sampling for them of people with whom Janiskee he has had various kinds and intensities of interactions throughout his life, with Janiskee approaching to ask, "So tell me, do you find me intimidating?", he fears the gathered data would amount to video depositions of statistically 100 out of 100 respondents being too incapacitated with laughter to respond.

Short of that, if anyone has ever thought Janiskee is best summed-up for his efforts as, "combative", it is a guarantee that it will be someone over whom Janiskee had no power nor ability to harm nor certainly that intent, beyond of his maybe ending-up in the wrong place at the wrong time, to find others being awful for reasons not at all do with him, in which case he might have offered a chart and an attempt at levity, and a long series of efforts at reasoning.

And as Janiskee got to right here on the page, on the night of July 23, 2023, writing certain bits out-of-order, he swears, his wife let out a scream when in a video call to her mother the phone was brought to his wife's little dog's basket, with her mother unaware that Momo was dead, of what his wife is convinced was a room allowed to get too hot, in a Fukuoka heatwave, for saving on utilities.

Janiskee worked hard, for his coworkers, and for family, some to whom he was sending cash. Now, if the defendants are wise, his wife's tears will be their priority.

### Count I: Intentional Infliction of Emotional Distress by Vertafore

*Vertafore's So-Called "Performance Improvement Process" Tactics*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's "Performance Improvement Process" November 2, 2022 conduct that:

273. Vertafore that day said Janiskee is the focus of a "formal process", as if Phillips and Heathman had just come from Vertafore's CSI lab, given that Phillips on-camera was attired for the event in neither top hat nor tuxedo.

274. Yet, Janiskee's attempts at focusing discussion on formalities like of facts, such as of his real actions, elicited from them ever-harsher invalidations.

275. Phillips and Vertafore acknowledged having no facts of Janiskee's conduct.

276. On fictions to repeatedly say 'formal process' thus was solely for intimidation.

277. Vertafore in employing intimidation acted to formally erase facts of Janiskee.

278. Vertafore shamed and intimidated Janiskee via accusations without basis.

279. Vertafore, impressively, as if unsatisfied with being just vicious or making Janiskee's job just logically impossible, produced innovations in the usually subjective notion of what is intentional infliction of emotional distress, by adding what can never square with Roper and Vertafore ethics portrayals, via a "double bind"— a "no-win" in which to call it a no-win is punishable.

280. Plus there's objectively that Heathman for Vertafore in the HR meeting, and Phillips just before it, conveyed that Janiskee should be emotionally distressed by their acts, and yet even in admitting lacking facts, *refused to stop*.

281. Vertafore example claimed of Janiskee that supposedly he is "combative".

282. When Janiskee asked for or offered facts about this, Vertafore used this as its "Gotcha!" evidence of "combativeness", though with Phillips's baiting only getting him as far as to declare, after near-daily interaction and infinite chances to have raised it, "I'm beginning to see some of that now"...*falsely*.

283. Vertafore's conduct in the meeting altered the deal, of Janiskee's contract, with Phillips implying an inversely-worded, "Pray I don't alter it any further", citing as if precedent in a jurisdiction far, far away from how it works here.

284. Janiskee signed no contract to abide Vertafore's unethical conduct or fictions.

285. Heathman's accusatory conduct for Vertafore was intense and unyielding, with Janiskee as if writhing in the pain of it while Phillips looked on.

286. Janiskee tried multiple ways of conveying on November 2, 2022 why he could not comply, yet in big and small ways always earning punishment.

287. A double-bind plausibly can trigger, for example, slow-burn schizophrenic prodromal psychosis, but for now Janiskee asserts only that it hurts like hell.

288. Portrayals for Vertafore by Phillips on October 13, 2022 regarding Janiskee's role for Vertafore client Fidelity made Vertafore actions in the meeting on November 2, 2022 also tantamount to "constructive discharge".

289. Vertafore actions about Utica had caused Janiskee to seek prior treatment.

290. Janiskee was paralyzed by the demands of the HR meeting logically and inescapably because Janiskee is not "combative", but a caring PM, with Vertafore causing emotional distress still ongoing and needing medical care.

291. Janiskee tried obtaining ketamine, legally, which he had never had, for his having read of it as a very fast antidepressant, since he wanted to be working.

292. Vertafore stuffed that up for him too, while its human resources organization showed itself to Janiskee to be unapologetically a menace, that had learned from *Nichols v Vertafore Inc.* only that it can get away with it, while their reprehensible conduct caused Janiskee loss of vastly more than just his job.

293. The most deeply painful problem of all caused Janiskee by Vertafore is his awareness now of this as harming others like him in exactly the same ways.

**Count II: Intentional Infliction of Emotional Distress by Roper**

*Roper's ESG Pandering and Code of Conduct Deceptiveness*

Incorporating all preceding paragraphs of allegations, Janiskee says of Roper's ethics manual, ESG materials, ethics training materials and CEO portrayals that:

294. Roper portrayed its CEO as if demanding conduct of a high ethical standard.

295. Janiskee completely believed, felt appreciation for, and felt pride to be associated with, and was emotionally moved by, Roper portrayals of its ethics.

296. Roper ethics materials set, for their context, a "reasonable person standard".

297. Janiskee at work, with humor and self-deprecation, advocated ethical conduct.

298. Janiskee was caused because of Roper portrayals to wrongly grant Roper, Vertafore, and Phillips, tolerance and goodwill that they outrageously abused.

299. Janiskee was caused by Roper's portrayals of its ethics to be led into painful, logically inescapable "double bind" circumstances not of his creation.

300. If Janiskee on smelling a rat can find *Nichols v Vertafore, Inc.*, so can Roper, who implemented nothing of its ethics like what Roper portrays to investors.

301. Before Janiskee was harmed by Vertafore's outrageous conduct, Roper for Vertafore had two years to make good on its ethics portrayals to its staff.

302. A 21 million dollar-a-year CEO of a publicly-traded S&P 500 component corporation making empty portrayals backed by no tangible reality or any apparent follow-through, in a video to all employees of all Roper subsidiaries, is a hidden-in-plain-sight signal as if of insanity defying reasonable grasp.

303. Janiskee by the shock of realizing Roper's portrayals to be a sham was caused emotional paralysis and still-ongoing suffering requiring medical care, for his being left unable to do his job without incurring illogical accusations.

304. Roper engages in empty ESG pandering as easily as Roper then talks proudly about fighting to deprive widows of mesothelioma compensation.

305. Since Janiskee's first filing this, Roper is no longer an NYSE or S&P 500 firm.

**Count III: Intentional Infliction of Emotional Distress by Vertafore**

*Vertafore Coercion for Subordinating of Project Manager Credentials and Judgment*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's exploitation of credentialed project managers for its illicit aims that:

306. Janiskee applied for his role at Vertafore based on a job description that listed a preference for a certified project manager.

307. Janiskee in his resume and interviews said he had been accepted to sit for the PMP exam, which he then passed, becoming certified in February 2022.

308. Yet, Janiskee in his PM role was not pedantic, obstructive, or combative.

309. Janiskee handled combativeness of Heathman, Phillips, Peck, and Bachman.

310. Janiskee on November 2, 2022 tried explaining to Vertafore that a PMP certified project manager has an obligation to act competently and ethically.

311. Phillips however did not let Janiskee finish this thought, as he inserted what Phillips thought Janiskee thought, to then explain how what Phillips thinks Janiskee thinks makes Janiskee wrong, by saying he had told Janiskee in the interview that Vertafore does not follow the 'PMP process', while silently Janiskee fought a battle within, against involuntary eye-roll reflexes.

312. There is no such thing as any "PMP process".

313. Janiskee assumes Phillips had actually meant to say "PMBOK process".

314. There is no such thing as any "PMBOK process."

315. Janiskee cannot be contracted to subordinate his credentials and judgment to 'mentoring' in whims of Phillips or Heathman, if unethically, to put it nicely.

316. Vertafore does not get to "PIP" a credentialed project manager on PM judgment as if for "culture" or to cheat—and can only *terminate or discuss or accept*.

317. Vertafore coercion for appearances of using credentialed project managers it then bullies into applying bad math in violation of ethical practices caused Janiskee double-binds and ongoing emotional-distress *and worry for others.*

**Count IV: Intentional Infliction of Emotional Distress by Justin Phillips**

*Phillips's Ambush Tactics and Falsity and Jekyll & Hyde Betrayal of Stolen Trust*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of harm Phillips caused through cultish manipulative ploys and intimidation that:

318. Tediously Phillips vaguely talked of being bad as a person, as if self-excusing it, or as if as warnings, or as if farting guilt into the air for relieving himself of it.

319. Phillips fostered an environment of gossip, negativity, and combativeness.

320. Phillips insisted that Janiskee is required to be snarky in order to fit in.

321. Yet, Janiskee showed no negativity at work for quite a while, and was not openly snarky at Vertafore for four-and-a-half months, fulfilling Phillips's expectations by instead being safely snarky to a District Court judge, then playing the hearing video to prove himself a worthy snark contender, testing riskier waters only months later in pointing-out to Phillips in front of his team that his high-end mic for videoconferencing is a "side address" design and pointed in the wrong direction, eliciting a flash of Hyde-like anger.

322. In Janiskee's recollection he had already explained this to Phillips, and that Janiskee had gained bits of esoteric audio knowledge working at a radio station when younger, all conveyed prior to the visit with Central Team to Phillips's home where Phillips's mic was displayed conspicuously wrongly-pointed.

323. Janiskee never again snarked-off to Phillips, giving nearly all stupidity a pass.

324. Ludicrously thus Phillips with a straight face by November 2, 2022 was telling Vertafore of a failed struggle at "mentoring" Janiskee at project management.

325. Phillips furthermore had remarked of emotional pain *he* said *he* felt of Utica's unwarranted abuse *of Janiskee,* yet then painted Janiskee to HR as culprit.

326. Janiskee with humor unassumingly also had pointed-out the pitfalls of venomously gossiping, to which Phillips agreed and then did it even more.

327. Phillips's ploys emotionally deeply pained, distressed, and harmed Janiskee, culminating with Phillips's part in the Nov 2, 2022 HR meeting and aftermath.

## Count V: Age Harassment by Vertafore

*In Violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA)*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of harm Vertafore caused him by fostering of a hostile workplace based on age that:

328.  Janiskee, age 51 as of November 4, 2022, is in an ADEA protected class.

329.  Janiskee was regularly praised in and was qualified for his Vertafore role.

330.  Janiskee suffered disparate treatment by Vertafore because of his age.

331.  Phillips for Vertafore on October 12, 2021 said Janiskee has too much experience, in a talk in which Janiskee had raised no relevant such issue, yet oddly with Vertafore saying that, "…this was a concern early-on…"

332.  On January 25, 2022, Phillips for Vertafore indicated hostility by Utica's Peck was undeserved by Janiskee—and so intense that *Phillips felt the pain.*

333.  On August 18, 2022, Phillips implied that when Vertafore thinks it can get away with it, it perpetrates discriminatory acts in violation of civil rights laws with full cognizance of what Phillips's actual words when the topic arose—of job applicant testing—were, "…I know exactly why they're doing this to people. But, and when I mentioned it to (Kristin Nease, Vertafore Senior Vice President, Human Resources)…she did not tell me I was wrong" and that, "these are the kinds of things that someone who's recently been to college is going to pass, but somebody with 20 years of experience who doesn't need to take ridiculous tests like this would have a harder time with."

334.  Janiskee unknowingly had defeated the age trap by passing Vertafore's tests.

335.  Phillips added two young recruits to his team on October 10 and 17, 2022.

336.  Phillips on September 19, 2022 had said Colleen Heathman was, "…mad at me because I made her spend more money on a new hire than she wanted to."

337.  On October 31, 2022, Phillips told Janiskee an HR talk was needed about him.

338.  On November 2, 2022, Heathman falsely accused Janiskee of mistreating Utica, USAble and HTK in a discussion *tantamount to constructive dismissal.*

## Count VI: Whistleblower Retaliation by Vertafore

*In Violation of Michigan's Whistleblower Protection Act*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says regarding Vertafore's retaliation for his having engaged in protected activities that:

339. Janiskee to Vertafore Human Resources on November 2, 2022 had made a whistleblower complaint earnestly but under duress and while in shock.

340. Janiskee knew nothing about whistleblower claims, nor had he heard about the civil rights claims made in *Nichols v Vertafore, Inc.*

341. However, Janiskee's whistleblower complaint to HR on November 2, 2022 was with the full intent of reporting wrongdoing to a public body.

342. Janiskee had experienced a progression of ever more overt and disturbing events, with Heathman's conduct the most unethical and untenable by far.

343. Janiskee was being routinely harangued including for getting him to act unethically, with no way he can subordinate his judgment and credentials without risk of arguably "project fraud" and "shareholder fraud", he feared.

344. Janiskee suspected Phillips did not want project transparency internally, as his real issue with his charts, yet with still-new Janiskee needing as much clarity as he could create, and given Vertafore abysmal project failures.

345. Janiskee had experienced Utica seeming to want to make project planning less reliable, as if maybe to win concessions from Vertafore for more failure.

346. That Heathman denigrated Janiskee as thus not "open" was as shocking to him as if to an accountant, with similarly potentially criminal outcomes.

347. Yet, Janiskee was never obstructive or needlessly pedantic about rules.

348. Janiskee's priority concern in the HR meeting was far from of avoiding HR punishment, and he did not abuse whistleblowing for any such ruse.

349. In fact, Janiskee had confirmed no wrongdoing by him was being cited.

350. Janiskee thus had ample reason to be alarmed at the HR meeting itself.

351. Even when Janiskee was asking about derogatory effects on him of the "PIP", his concern was about how he was supposed to do his job ethically.

352. He wanted to know the meeting's ramifications, so asked if a derogatory letter about him was being put on file, versus if a talk was the only goal, as a derogatory letter could mean more punishment for competence to come.

353. Janiskee's every attempt at explaining the ethics of the situation and why circumstances were preventing him from complying earned him berating.

354. Janiskee saw no ethical way of committing to HR expectations of him.

355. Phillips's and Heathman's flimflammy "culture" and being "open" nonsense was reprehensible to Janiskee, who instead needed 1+1 to equal 2.

356. Janiskee found unsettling the arbitrary time pressure attached by Vertafore in the meeting for his signing his "acknowledgment".

357. Janiskee wanted to keep his job, without the games, and he also wanted his boss happy, and he knew he could do all of that, but thought Vertafore maybe needed a legal nudge, but that he anyhow could manage Phillips.

358. Mostly Janiskee was concerned and confused and wanting things set right.

359. However, as Vertafore is a subsidiary of a publicly-traded company, and as it said it wanted a certified project manager, Janiskee believed that for him to ever knowingly choose less than prudent and ethical approaches or ever obfuscate anything from Vertafore could incur far greater risks, including legally or criminally, that Vertafore expects him to safeguard, and with Janiskee uncomfortable with what was happening, whistleblowing served the public good and made sense in light of all the bizarre bullying he had endured and that now Phillips and Heathman were perpetrating against him on no facts, heartbreakingly.

360. Aside from the public good, he also knew he had committed no wrong, and that treatment to which he had been all along subjected was hostile.

361. Janiskee knew unethical conduct being leveled at him needed to stop, so he blew the whistle when it was clear Philips and Heathman would not budge.

362. Heathman said matters would be escalated to a higher-ranking manager, as Janiskee too wanted, with Heathman naming her boss, Molly Garrison.

363. Janiskee would have preferred all matters to be resolved with just a talk with Garrison, but he was right in sensing he had reached his options' end, never hearing from Senior Director, Human Resources Molly Garrison, until January 6, 2023, about the third-hand used laptop still in diehard optimist Janiskee's possession, with Garrison threatening legal action.

364. Janiskee when pressed babbled to Heathman of wrongnesses generally, with what came out of Janiskee sounding like legal cause of action words, with no such intent, having not planned legal action against Vertafore.

365. As it turns out, Michigan law makes Vertafore's response to Janiskee's whistleblower claim unlawful even if his claims had been legally all bunk.

366. To whistleblow was right even as Janiskee struggled to articulate the wrong, since, on February 10, 2023, Janiskee discovered of *Nichols v Vertafore, Inc.*, that much of what Nichols had merely alleged, Janiskee had documented.

367. Vertafore terminated Janiskee on November 4, 2022, telling him 19 days later, via random-seeming Denver HR manager Jake Hunzeker, who said Vertafore had decided Janiskee had quit, which Janiskee replied is false.

368. Janiskee on December 3, 2022 got a more definite sign of his termination, from an insurer letter saying his coverage had ended November 4, 2022.

369. Janiskee now wonders if Hunzeker had authority to make statements he did.

370. Janiskee does not accept November 4, 2022 can be his termination date, except for the purposes of showing whistleblower retaliation was clear.

371. Janiskee did not resign and arguably got no termination documentation.

372. December 3, 2022 is arguably the date Janiskee knew he was terminated.

## Count VII: Defamation by Justin Phillips

*Defamation of Character*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Phillips's statements constituting defamation of his character that:

373. On or before November 2, 2022, Justin Phillips to Human Resources at Vertafore made derogatory portrayals of Janiskee's Vertafore performance.

374. In a meeting then with Phillips and Heathman and Janiskee that day, Vertafore admitted a derogatory assessment of Janiskee was being put on file.

375. The performance problem was summarized by Phillips to Janiskee as *not* that Janiskee is "...combative, instructive in almost a condescending way, and defensive...", but that, of Janiskee, Phillips thinks others think this.

376. Janiskee is not "defensive". Why would he be defensive? And he is not "*almost* condescending", which is *almost* the stupidest thing he has ever heard in his life from a corporation about a project manager, and might, for a project manager, or even, say, a judge, *almost* be like a compliment, and, he is not "instructive", unless meaning eager to share baking tips or safeguards against committing, for Roper, Sarbanes-Oxley violations for a better bonus, just to get handcuffed in an FBI raid and sent to federal prison.

377. Where ~~shit~~ got defamatory was, at the least, when Phillips proceeded to put-on a virtual ventriloquist act, of characters who think these thoughts about Janiskee, assigning them names of clients or people he then put on his knee, while they spoke in angry voices that did not quite fit, as Janiskee tried politely pointing-out it was Phillips's mouth that was moving.

378. Although in Janiskee's opinion the sheer stupidity of what played-out was hard to take, he remained professional about it at the time.

379. Janiskee had not presumed an HR department needs to agree with him, but, Vertafore's eagerness to lap-up Phillips's act was the true deep scary wrong.

380. Phillips had on October 31, 2022 told Janiskee of the meeting with HR to be held about him, which was then agreed would be on November 2, 2022.

381. Janiskee asked to be told the intended meeting issues, but Phillips refused.

382. Phillips on November 1, 2022 contacted Janiskee, insistently wanting to change the agreed HR meeting date to be that day instead, despite that Janiskee had asked for November 2, 2022 specifically.

383. Janiskee for privacy wanted the meeting held when he would be home alone.

384. Phillips expressed concern that Janiskee had not attended the Central Team morning meeting, which was despite that the meeting is advertised as participation-optional, and despite that Janiskee and others missing the meetings was normal, yet, Phillips because of this said he wanted to move the HR meeting forward, in order to ease anxiety in Janiskee.

385. Janiskee explained that in the morning he had been occupied because of client meetings, yet Phillips, as if still for Janiskee's "anxiety", persisted.

386. For Janiskee, it was a recurring theme by that point, that Phillips would make an assertion of him, of a feeling or state, in combination with an event or action, with the emotion assertion inaccurate, only to have the assertion make the asserted emotion then actually the truth of Janiskee, with then feelings becoming a red herring from the topic actually at-hand, with Phillips's fix for Janiskee's "anxiety" then causing Janiskee anxiety.

387. Janiskee believed he had been too tolerant of Phillips's shenanigans, and was being summoned to an HR meeting as a result, so he told Phillips that it seemed his need to move the meeting was about anxiety in Phillips, as if Phillips talking about helping Janiskee's "anxiety" was Phillips talking about soothing anxiety in Phillips, with Janiskee then saying that when Phillips seems to have anxiety bouts that he has a tendency to start making stuff up about Janiskee, and that it is becoming a problem, and needs to be recognized, and that Phillips is a caring guy who just worries too much.

388. Just as Janiskee in writing had stated, Phillips in the November 2, 2022 HR meeting made statements so contrary to any facts or to his own prior words as to be outlandish, in some cases for just the absurdly vast scope of his *omissions*, and in other cases which were just flatly untrue.

389. Phillips's statements about Janiskee, even if to Human Resources, were so grossly false, and thus only personally driven—instead of to do with correct company objectives—that they are not "privileged" like in the way of un-abused privileged work communications that might involve honest error.

390. The outlandish portrayals on a general-level included for example that Phillips had been "mentoring" Janiskee in regard to project management, and that Phillips's attempts at mentoring Janiskee were unsuccessful, and that Janiskee was supposedly aware of this, that Phillips and Janiskee at times engaged in legitimate project management discussions, that Janiskee is unsuccessful in his role at Vertafore and unsuccessful with customers and that supposedly Janiskee knows this, and that Janiskee had supposedly mistreated Vertafore clients, all of this being grossly false, or at least for a human resources derogatory so-called "formal process".

391. Janiskee at no point saw evidence of Phillips as capable of project management, and the prior day had essentially told Phillips he thinks Phillips delusional.

392. At about five minutes into the HR meeting on November 2, 2022, after Janiskee was given a token chance to speak, and said Phillips's words did not match his perception of events, Phillips turned combative, instructive in almost a condescending way, and defensive, in saying that Janiskee is "...combative, instructive in almost a condescending way, and defensive..."

393. Phillips's description was of Phillips, as the words had no grounding, were a combat ambush, for no valid aim, and thus just character assassination, or self-assassination, like 'death by cop', by, c'mon, a project manager...why?

394. Technically, Phillips's accusations of Janiskee were supposedly client sentiments, not Phillips's own accusations, although Phillips then claimed, "And I've seen that to some degree", which Janiskee supposes is as-worded not technically defamatory even if complete and utter horsesheets.

395. Because, what Phillips then submitted as his support, while getting snippy with Janiskee for his not agreeing to fictions of him portrayed as if fact, was, "And we can talk about, for example, when Robert at Utica said, 'Hey, I don't need a lecture on how to be a project manager'."

396. Phillips to this bombshell added, "So, I've had an opportunity to see some of those things."

397. The only problem is that, no, Phillips never had an opportunity to see that thing, since that thing never happened, and since Utica National Associate Vice President Robert Skrzypinski does not even talk that way.

398. What Skrzypinski said was, "We have experienced project management people on our side as well. I mean, I'm a certified PMP with over 35 years in the business and I grew up as a developer and project manager".

399. The two messages are very different, because, believing Phillips's false one *requires* that *Janiskee* was rude and unprofessional, *unlike in reality.*

400. Janiskee does not know, but thinks it possible, that the reason Phillips portrayed Skrzypinski to sound like a blockheaded ninny in the HR meeting about supposedly Janiskee's performance was because Phillips was doing an impersonation of Janiskee doing an impersonation of Skrzypinski saying things that Skrzypinski never said, because Phillips encouraged confiding and snarky gossip, only to have Phillips trot-out in front of HR the caricature inside of Janiskee's mind of a Skrzypinski who hates Janiskee, because Janiskee, to confirm the guy's name spelling for meeting minutes, and with Google faster than retrieving a meeting invite, he ended-up on Skrzypinski's LinkedIn profile, not updated since joining

Utica apparently and presenting him instead as a project management consultant, with Janiskee's comment to Phillips on February 16, 2022 probably being something to the effect of that Janiskee had done nothing to try to step on Skrzypinski's toes, and was just doing his job, because Janiskee did detect an attitude about him, though actually Skrzypinski's real words were not so bad.

401. What Janiskee's forthcoming affidavit will say about Utica is:

> In response to Utica's attempts to hijack planning of what they did not yet understand, I had counseled patience, with however Skrzypinski saying, "We have experienced project management people on our side as well. I mean, I'm a certified PMP with over 35 years in the business and I grew up as a developer and project manager",  with this being out-of-step with my politeness or my point, and that I was just the assigned PM guy doing the PM stuff, with Phillips telling Skrzypinski, "Alright. Hold on. So, I think what we have is the answer that we need...we can do it multiple ways...that's what we're trying to, what we're trying to figure-out is what's the best fit for you guys. So, we can do, where you can create a large spreadsheet and just upload it, and it'll create a whole batch, or where you can make a web service call and say, you know, this is what needs to be terminated. And, from our perspective, that's not TLOP, that's just, you have sent us a termination...Is that the kind of thing that you're looking for, for an answer?"

402. Phillips's defamatory portrayal of Janiskee as rude and combative, by portraying an insurance carrier executive as bursting with umbrage at him, in the November 2, 2022 meeting—in which Phillips also acknowledged he had no facts of any instance of Janiskee actually doing anything wrong—was because of nothing to do with Janiskee.

403. Phillips had a personal agenda, and a conveniently vulnerable employee, but no facts, and thus no rationale for any "improvement" of any mystery conduct that nobody can cite of Janiskee, such as of what horrible act by Janiskee triggered Skrzypinski *to start sounding like Justin Phillips*.

404. Phillips recalled rudeness of Skrzypinski, yet glossed past what Janiskee even said to cause it, for Janiskee's "Performance Improvement Process" no less, because it was Skrzypinski who started the rudeness, not Janiskee, hard as that may be to believe of Utica National Insurance Group.

405. Janiskee's perception of what had occurred was that Utica's Shannon Peck came down on him so harshly in the second project meeting that Phillips then on January 25, 2022 said even he could feel the "slap", and which entirely had been due to Vertafore issues prior to Janiskee, to then have Skrzypinski get word of it and, as if smelling blood in the water, show-up at the next meeting specifically angling to troll, and he acted belligerently, in his Canadian project manager gentle sort of way, as if nevertheless purely to get in-line after Peck for the fun of a slap at Janiskee too, in which case meaning that, on November 2, 2022, that Heathman slapped Janiskee, metaphorically, simply because Phillips slapped Janiskee, which was simply because Skryzipinski slapped Janiskee, which was simply because Peck slapped Janiskee, which was what Phillips said on January 25, 2022 was totally undeserved.

406. Janiskee never made any drama about this stuff, until he got literally fired for it, for others slapping him, egged-on by Phillips, with Phillips seeing in one opportunity after another in which he never did a thing other than to reward and encourage the slaps and blame the slappee.

407. Phillips had absolutely no facts for his swindle, so he thieved from Janiskee his professional reputation.

408. Janiskee on multiple occasions had proudly said he intended to anchor himself to Vertafore for as long as they will have him, and Janiskee thus was naturally diligent and careful in his work and his treatment of Vertafore clients—leaving Phillips resorting to putting on his puppet show for destroying Janiskee's professional reputation and arguably career.

409. In addition was the repeated trotting-out, and beating to death of, the notion by Justin Phillips in the meeting that three clients had "escalated", as if due to Janiskee, which itself is no fact of Janiskee nor any description of his conduct, and is nothing he can control, since for example he had all of 30 minutes with USAble, yet had held 14 internal meetings to prepare for that, and Emily Connell and Paul Zipfell and Janiskee got-on just fine, with Vertafore upper management's despicable response not Janiskee's call.

410. At no point in the November 2, 2022 meeting did Janiskee succeed in his attempts at getting Justin Phillips to focus on relevant facts or admit that his having none yet continuing the attack was vile, his relying instead on obfuscation and falsity and Janiskee being vulnerable, while Phillips made Janiskee's job impossible and thus, metaphorically, ripping his life to shreds, and even portraying himself as owed gratitude, with the math Phillips uses for calculating why he gets to do this to Janiskee being:

> So the problem that we're, with, that we have is, you know, as you've encountered, we have customers who are struggling with their interactions with you as a project manager, to the point that we have now had three escalate to leadership and ask for you to be removed from a project. In isolation, you know, it happens. And, but when it becomes a pattern, and you heard me talk about this before, that I care about patterns. So when it becomes a pattern, it becomes a concern.

411. When humankind surpasses its present rudimentary grasp of logic of the confining mere Boolean kind, to embrace Phillipsian logic in which what is a falsity can be a truth, and vice versa, metamorphically magically, that

- 66 -

is when Janiskee might address whatever Phillips was meaning above, for posterity here pointing future scholars of Phillipsianism to Janiskee's forthcoming affidavit about the USAble and Utica projects, that may reveal these "patterns" that Phillips, at purely his convenience, sees and "cares" so very much about, on which Vertafore upper managers and officers put full faith most complacently, if just Phillips so sayeth, and by which what Phillips said on October 12, 2021, and what everyone had said of Utica throughout January 2022, simply no longer is anymore, as Phillips made clear in his continuing, on November 2, 2022, that:

> And in those cases, two of them, you know, were very resistant to, were absolutely unwilling to have you back on the project. The other the more recent one, they you know, they were they understood that we shouldn't change horses midstream, but they all escalated to leadership. And so it's something I've seen, it's something you're experiencing, and it's something our customers are experiencing and saying 'We don't appreciate' and it's also something now where leadership is asking questions, 'Why is this consistently happening with your project manager, Doug?' So, what we're hearing from customers is that you're combative, instructive in almost a condescending way and defensive. And I've seen that to some degree. And we can talk about, for example, when Robert at Utica said, Hey, I don't need a lecture on how to be a project manager. So I've had an opportunity to see some of those things.

412. The other defamatory fib to HR by Phillips, after Phony Livid Skrzypinski, is the malicious utter falsehood that "the more recent one", above, which is Penn Mutual, had "escalated" when in reality *Janiskee escalated them,* and with Penn Mutual's Amy Bachman having wanted to deal not with Phillips but with Janiskee—whose escalation to Phillips instead was done by Janiskee in close consultation with Account Management…and Phillips.

413. Vertafore found Phillips had produced such persuasive and irrefutable evidence of what a jerk Janiskee is that it awarded Janiskee instant "constructive discharge", damaging Janiskee financially and emotionally.

**Count VIII: Tortious Interference with Contract by Justin Phillips**
*Tortious Interference with Contract*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Phillips's actions as an individual to interfere with Janiskee's employment that:

414. Not only were assertions on November 2, 2022 overwhelmingly inaccurate, and in at least two ways defamatory, what Phillips said of happenings that was false was for a PIP outcome ludicrously out-of-alignment with what he was saying to Janiskee in Phillips's other compartments of reality.

415. Phillips constructed for Vertafore what became Vertafore's constructive discharge of Janiskee, although Janiskee sees Vertafore as more culpable.

416. Phillips simultaneously caused Janiskee an impossible series of binds that Janiskee did his best to surmount but were logically paralyzing.

417. On September 19, 2022, Phillips told Janiskee Heathman was angry at Phillips because of Phillip's spending on a new hire.

418. On September 21, 2022, Phillips told Janiskee, seemingly not entirely jokingly, that client Fidelity had told Phillips what a bad person Phillips is.

419. On October 10, 2022, Phillips explicitly said to Janiskee that as project manager for Fidelity that Janiskee would at times need to tell Fidelity 'no'.

420. Janiskee had met with the Vertafore-side staff supporting Fidelity, and after some listening, he wanted to help them with boundaries in clear need of setting, and he steeled himself for it, and he knew he could do it well if supported, but, he never wanted actual conflict with Fidelity, so he sought clarity on how best to engage—as he had always done prior to pretty much any of his assignments, prompting an October 13, 2022 meeting arranged by Janiskee at Phillip's request with Ms. Laurie Reeves of Vertafore's Sircon Managed Services ("SMS") division.

421. In the October 13, 2022 meeting about how to set boundaries with Fidelity, Phillips mentioned that Fidelity is a client who, when they escalate, meaning out of dissatisfaction including with the project manager, that their tendency is to escalate straight to Vertafore CEO Amy Zupon.

422. Yet Janiskee at no time caused drama, including from October 13, 2022 to the moment on October 31, 2022 when told of the HR meeting about him.

423. If Janiskee had been the cause of client dissatisfaction for USAble and Utica or anyone, why give Janiskee his highest-profile project to-date and tell him the mission is of *setting boundaries* with the toughest client yet?

424. Janiskee thought he was being recognized as someone able to handle pressure and still deliver and watch-out for Vertafore's interests.

425. Yet, everything implied in the HR meeting on November 2, 2202 was about how supposedly Janiskee is awful to clients and mistreats them.

426. Vertafore made clear that the facts of Janiskee ethics and conduct and his available options and his specialized experience and certification have absolutely no bearing how he will be treated, and that Colleen Heathman gets to override all of that with the daft command that Janiskee the credentialed project manager needs to be more "open".

427. Even setting Fidelity aside, it is impossible to be a project manager at Vertafore and not incur complaints, with Janiskee's impression being that most try avoiding it through ways mildly inept or mildly unethical.

428. Phillips knew Janiskee could not possibly comply with the expectations implied of him in the November 2, 2022 HR meeting.

429. Phillips's portrayals and omissions put Janiskee wrongly in detriment in ways making his work impossible and his contract unworkable.

## Count IX: Sexual Harassment by Vertafore
*Vertafore's Disparate Treatment Based on Gender*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's practices that foster a hostile workplace based on gender that:

430. Janiskee suffered sexual harassment by Vertafore when Janiskee tried applying sound project management practices, only to be told he was wrong, as Heathman for Vertafore implied of Janiskee as if for being dubious of advice by Phillips, with Phillips claiming he had explained to Janiskee that rather than sound project management practices Janiskee needs to integrate with Vertafore "culture", when what Phillips had told Janiskee is that women run the departments that are Vertafore's de facto clients, and since women do not respond to logic, a logical PM approach is wrong.

431. Janiskee as a credentialed project manager is obligated to resist unethical attempts at subordination of his judgment to misguided Vertafore asininity.

432. Except for Heathman and her bosses, Sircon women outmatch Phillips at logic.

433. Phillips and Vertafore do not get to punish Janiskee for gendered reasons.

434. It had been Roush, not Janiskee, who on December 23, 2021 countered Colleen Giuliano's request for API documentation in advance, but female Peck of Utica instead targeted male Janiskee for this, in what Phillips said had been undeserved and wrongly made personal about Janiskee, with big-talking Phillips then refusing to support Janiskee, with instead Phillips and Heathman for Vertafore *punishing Janiskee for Peck's conduct.*

435. When on August 17, 2022, Janiskee said he thinks women are not worse leaders than men but that people who prioritize competence avoid roles of responsibility over others, with women manifesting incompetence just in different ways, arbiter of Vertafore culture Phillips said, "Dude, women don't want to be responsible for shit, so therefore they can't be in-charge."

- 70 -

436. Janiskee's advice was repeatedly asked by coworkers about words of Phillips.

437. Janiskee had told Phillips of tragedy related to his globe-trotting years of extended bachelorhood, in which multiple times he had encountered women, of other national origins, who were rich and powerful and who would suddenly launch into mini-tantrums almost entirely inexplicably, until finally they would spell it out explicitly to a baffled Janiskee that what they wanted was to be physically hit, with the tragedy of it being that Janiskee always refused, thus leaving not-himself-wealthy-Janiskee to a life of instead having to work for someone like Justin Phillips.

438. So when Janiskee became subject to unwanted attention from a Vertafore client insurance carrier client female assistant vice president that was illogical, baffling, persistent and focused on Janiskee personally for no valid reason, including while she openly denigrated herself through her behavior in front of her own team, re-traumatizing Janiskee about his chosen life, of not being a woman-beater for cash from the rich women who had begged him for it, because he has principles and stuff, with Janiskee giving the insurance carrier vice president exactly what she wanted in non-physical form—with consummate professionalism and after a clear record of their negotiating about it—to get her unwanted attention mitigated, only to end-up receiving a report back, from Phillips, for the first time, on November 2, 2022, that apparently the assistant vice president of the insurance carrier told Phillips, to whom Janiskee had escalated her, how Janiskee makes her feel, and that Janiskee is the horse she chooses not to change, with the licensing departments of America's insurance industry finally making some sense to him.

439. For gendered reasons Janiskee was caused financial and emotional harm.

## Count X: FMLA Interference

*In Violation of FMLA 29 USC 2601*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's violation of law and its promises to him regarding leave that:

440. Vertafore's termination of Janiskee two days after his whistleblower claim to them, while Janiskee was on agreed PTO, can only make sense in a scenario in which Vertafore thinks Janiskee has no evidence of what occurred, which would be because Janiskee explicitly had asked for the recording of the November 2, 2022 meeting that Phillips had made, which maybe made Vertafore think Janiskee has no such recording.

441. Janiskee had in the November 2, 2022 meeting repeatedly requested time off, because he was being made paralyzed by illogical and unethical behavior and expectations with which he could not comply—despite his wanting to be compliant and wanting to be good at his job, for Vertafore.

442. It was agreed that Janiskee would be contacted about extended leave as an option, which however was a promise never properly fulfilled.

443. Vertafore deemed Janiskee supposedly resigned as of November 4, 2022, which is false, as Janiskee had communicated clearly.

444. Janiskee was entitled to leave for the serious medical condition he tried mitigating and had tried conveying to Vertafore, who stonewalled him.

445. Janiskee aimed to comply with Vertafore FMLA portrayals that led nowhere.

446. Janiskee was always diligent about attendance and upholding his duties.

447. Janiskee stayed communicative but got no replies from Phillips after "11/2".

448. Vertafore engaged in prohibited acts in retaliating against Janiskee for requesting time off under the FMLA, by terminating Janiskee's employment.

449. Janiskee was caused confusion and emotional distress, and ultimately was deprived of his job, *and blamed for it*, despite that leave as discussed and in-line with ethics portrayals might have made possible a resolution.

### Count XI: Conspiracy by Roper and Vertafore

*Roper and Vertafore Obfuscation of Lines of Accountability*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Roper and Vertafore practices that obfuscate accountability that:

450. Causes of action in this complaint about Vertafore have connections to what Vertafore did to Janiskee on November 2, 2022.

451. Everything wrong that Vertafore HR did to Janiskee had cover from Roper.

452. The promise-maker does not get to flee when the promise is found empty.

453. For however wrong Janiskee deems the conduct of Phillips to be, he sees what Phillips did to him more like a demonstration of how fallacious is Vertafore and Roper from the very top.

454. Roper should not get to just say 'Oops!' for obfuscating lines of accountability, playing it both ways to hide now if Janiskee, at Vertafore, by Roper, is harmed.

455. To give Vertafore's human resources managers a presumption of innocent ignorance of the existence of Roper's code of conduct is unreasonable, and when Vertafore human resources managers act in contravention of the Roper code of conduct—on which Janiskee was made to study and take quizzes and earn certifications annually—Vertafore acts with knowing intent.

456. Roper willful ignorance of Vertafore noncompliance with what Roper's CEO claims to all employees of all subsidiaries, is even less excusable.

457. Roper's ethics video and its training requirements are an utterly overt act.

458. Vertafore knew how and why Janiskee would be unprepared for its tactics.

459. Roper set Janiskee on a suckers' tee and looked away, hiding in the video framing of a distant untouchable leader, and Vertafore HR took its swing, causing Janiskee to whistleblow such un-Roperly conduct, as in-his-fifties Janiskee was shoved out the door and off the books, with Cybersecurity Head Maggie Warren shrugging and saying, "What meeting recording?"

460.  Janiskee has read articles suggesting that to "pierce the corporate veil" is an attorney dark art confidently practiced by only a rare and brilliant few.

461.  Janiskee is no attorney and is running out of time for any more Googling, and does not know if he needs to be piercing anything really, but offers that if Roper holds still that he will try to get this over with as painlessly as he can.

462.  Roper's code of conduct materials explicitly apply to all Roper subsidiaries, and, Roper and Vertafore cooperated to present them to Vertafore staff.

463.  Roper portrayed to Janiskee that it exercises influence over Vertafore such that its employees must conduct themselves highly ethically.

464.  When a Vertafore employee asked General Manager Jon Newpol what the holdup was with decisions on compensation, Newpol cited Roper approvals.

465.  Believing Vertafore observes Roper's code of conduct made Janiskee easily ambushed with tactics hinted at in the Amanda Nichols complaint.

466.  The November 2, 2022 HR meeting content was an overt act by Vertafore, as was terminating him two days later after his having blown the whistle.

467.  Roper and Vertafore should not at their convenience get to demand that walls they walk through now suddenly require all to mime act as if solid.

468.  Roper and Vertafore together agreed to present Roper's ethics materials to Janiskee, and to any or all other Vertafore staff, as if thus obfuscating lines of accountability to any employee who may suddenly be victimized by the utter brain-unzipping cognitive dissonance caused by attempting to hold in mind simultaneously the image of a logo lobby Larry ethics speech and the Vertafore horror show human resources department truth.

**Count XII: Wrongful Termination by Vertafore**

*Vertafore's Termination of Janiskee in Violation of Public Policy*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's unlawful retaliatory termination of him that:

469. Vertafore wrongfully terminated Janiskee's employment in violation of public policy and Michigan law.

470. For at least 19 days Vertafore hid from Janiskee that he was terminated.

471. Janiskee does not even know if he was terminated actually correctly.

472. Vertafore fallaciousness deprived Janiskee even of unemployment benefits.

473. Vertafore terminated Janiskee wrongly, for all foregoing reasons, causing him financial and emotional and medical harm.

474. Janiskee had not been prepared for whistleblowing until he observed the conduct of Vertafore itself in the November 2, 2022 meeting, in the form of Colleen Heathman's belittling and fallacious behavior, to his horror making him realize lapses of integrity apparent of Phillips were true of HR.

475. Janiskee was being subjected to ticking-clock time pressure by Vertafore.

476. Janiskee for his inquiry earnestly described what he was experiencing, but in words maybe sounding unintentionally like legal causes of action.

477. Janiskee was told on November 23, 2022 that he had been terminated.

478. Documentation suggests the real termination, unbeknownst to Janiskee, was on November 4, 2022.

479. As a direct and proximate result of Janiskee's wrongful termination, Janiskee has suffered and continues to suffer damages, including but not limited to loss of income, loss of benefits, emotional distress, and damage to his professional reputation.

## Count XIII: Breach of Contract by Vertafore

*Vertafore's Betrayals of Janiskee's Trust*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Vertafore's breaking of promises made to Janiskee that:

480. Vertafore breached written and implied contracts that set terms and conditions of Janiskee's employment, via the *Vertafore Employee Handbook* and *The Vertafore Way* that he signed and was made to write essays about.

481. Janiskee performed his duties in good faith in accordance with all contracts.

482. Under the terms of these contracts, Vertafore had a duty to provide Janiskee with a safe and non-hostile work environment and to treat him fairly and in good faith, and to adhere to applicable laws and regulations.

483. Vertafore breached its contracts with Janiskee via wrongful termination, age harassment, sexual harassment, FMLA interference, whistleblower retaliation, and intentional infliction of emotional duress.

484. Janiskee as a direct and proximate result of Vertafore's breach of contract has suffered damages, including but not limited to loss of income and benefits, emotional distress, and other economic and non-economic losses.

## Count XIV: Promissory Estoppel—Vertafore

*About Vertafore's Marketing-Driven Empty Ethics Portrayals*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says additionally of Vertafore's false promises made to Janiskee that:

485. Janiskee asserts a claim of promissory estoppel against Vertafore, given its promises of its integrity issued falsely to his detriment.

486. Vertafore made representations of providing an ethical work environment, honoring commitments, and adhering to high standards of integrity.

487. Janiskee relied in his ongoing employment on Vertafore ethics promises.

488. Vertafore failed to fulfill their ethics promises, breaching their obligations.

489. Janiskee relied on Vertafore promises to his detriment by his continuing employment and invested time and effort into his work, for the outcome of emotional distress and financial loss due to the defendants' actions.

490. Janiskee asserts that it would be unjust and inequitable to let Vertafore to go back on their promises and escape liability for their actions.

### Count XV: Breach of Contract by Roper

*Roper's Code of Conduct Training and Quizzes and Certificates Falsities*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Roper's breaking promises to Janiskee about its high ethical standards that:

491. Roper in making Janiskee study, take quizzes about, and earn annual certificates about its portrayals to him of its ethical standards created a written or implied contract establishing key terms of his employment which Roper breached either intentionally or through inexcusable neglect.

492. Janiskee by performed his duties in compliance with Roper expectations.

493. Under the terms of the contract, Roper had a duty to provide Janiskee with a safe and non-hostile work environment and to treat him fairly and in good faith, and to adhere to applicable laws and regulations.

494. Roper breached its contracts with Janiskee by its taking no discernible action to implement its promises to him of maintaining ethical standards.

495. As a direct and proximate result of Roper's breach of contract, Janiskee has suffered damages including but not limited to loss of income and benefits, emotional distress, and other economic and non-economic losses.

## Count XVI: Promissory Estoppel by Roper

*Roper's High Standards of Integrity That Beg Questions of What Would It Call Low*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says additionally of Roper's false promises made to Janiskee that:

496. Janiskee asserts a claim of promissory estoppel against Roper, given its promises of integrity high standards issued falsely to his detriment.

497. Roper made representations of providing an ethical work environment, honoring commitments, and upholding high ethical standards

498. Janiskee relied in his ongoing employment on Roper integrity promises.

499. Roper failed to fulfill their integrity promises, breaching their obligations.

500. Janiskee relied on Roper promises to his detriment by his continuing employment and invested time and effort into his work, for the outcome of emotional distress and financial loss due to the defendants' actions.

501. Janiskee asserts that it would be unjust and inequitable to allow Roper to go back on their promises and escape liability for their actions.

## Count XVII: Gross Negligence by Vertafore and Roper

*Roper and Vertafore Ethics Mere Window-Dressing for Show and Share Price*

Incorporating all preceding paragraphs of facts and allegations, Janiskee says of Roper and Vertaore negligence that:

502. Vertafore and Roper demonstrated reckless disregard for the rights and safety of Janiskee in knowingly making ethics false promises he believed.

503. Vertafore and Roper had a duty to put into practice their ethics claims.

504. Vertafore and Roper allowed wrongful termination, age and sex harassment, and cited wrongs herein, harming Janiskee financially and emotionally.

## Request for Relief

Janiskee has suffered severe and still-ongoing injuries as a direct result of conduct by the defendants, making him entitled to recover damages for medical expenses, lost income, and pain and suffering, and other appropriate remedies, which he asks that a Charlevoix County jury be allowed to decide as however just.

Janiskee is under extreme duress by the circumstances of upheaval to his life caused by the actions of the defendants, which he asks be found extreme and outrageous—and absolutely triable in the 33rd Circuit Court.

Unfortunately all too obvious to Janiskee is that he was victimized because Vertafore's last victim taught them that hurting people—for profit, for bonuses, for share price, or for just convenience—is up to their discretion, on whim, and with no need for any worry of any real consequences, or at least not to them.

Given no change in behavior since *Nichols v Vertafore*, likely the defendants will not rethink their priorities unless ever made to feel what they inflict blithely, like of panic, on being ambushed and unfairly accused, and shame and self-doubt, plus pain like of one's heart ripped-out each new day for every lost relationship, and despair at seeing family deprived for one's own mistake, of granting trust to those whose talent is of rationalizing its abuse, and patting themselves on the back.

Logically, what Roper pays a leader to fib on-camera cannot suffice as an amount in punitive damages for deterrent effect on top of damages mentioned. Janiskee thus asks for the equivalent of its CEO's full compensation for the time Janiskee spent believing Hunn's words by working at Vertafore, times two, split by the two corporate defendants, plus double Phillips's pay for that period, paid by Phillips...or his daddy.

Respectfully submitted,

July 25, 2023

Douglas Janiskee
Plaintiff

Charlevoix County Clerk
JUL 25 2023

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

- 79 -

## Certificate of Service

I certify that on the date below a copy of this instrument was served on the Defendant's attorney or a corporate officer by first-class mail or equivalent suitable means to their last-known address as defined in MCR 2.107(C)(3).

July 25, 2023
_____
Date

Douglas Janiskee

Charlevoix County
Clerk

JUL 2 5 2023

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

- 80 -